UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x
CHARMAINE FRASER,

                          Plaintiff,          **MEMORANDUM AND ORDER**

      -against-

                                          12-CV-5778 (KAM)(CLP)
MTA LONG ISLAND RAIL ROAD,

                          defendant.
------------------------------------x
**MATSUMOTO, United States District Judge:**

          Plaintiff Charmaine Fraser ("plaintiff") brings this action against her employer, defendant MTA Long Island Rail Road ("LIRR" or "defendant"), alleging gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C.§ 2000e *et seq.*, as amended ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code § 8-101 *et seq.* (the "NYCHRL"), as well as violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (the "EPA") and the New York State Equal Pay Law, N.Y. Labor Law § 194 (the "NYEPL").  Defendant now moves for summary judgment with respect to the Title VII, NYSHRL and EPA claims alleged in plaintiff's amended complaint.  For the reasons set forth above, defendant's motion is granted.  The court declines to exercise supplemental jurisdiction over the causes of action brought under the NYCHRL and the NYEPL, which are dismissed without prejudice to pursuing them in State court.

## BACKGROUND

Unless otherwise stated, the following facts are either not in dispute, taken from plaintiff's own version of events, or taken from documents provided by counsel. Plaintiff is an African-American woman who was born in March 1978. (Declaration of Saul D. Zabell in Opposition to Defendant's Motion for Summary Judgment ("Zabell Declaration"), Ex. 15; Declaration of Kevin P. McCaffrey in Support of Motion for Summary Judgment ("McCaffrey Declaration"), Ex. II.) In May 2000, at age 23, she was hired by the LIRR as an Assistant Conductor. (Defendant's Rule 56.1 Statement ("Def. 56.1"), ¶ 1; Plaintiff's Rule 56.1 Counterstatement ("Pl. 56.1"), ¶ 1.) In late 2001, she became an Assistant Stationmaster ("ASM") trainee. (Def. 56.1, ¶ 2; Pl. 56.1, ¶ 2.) She remained an ASM trainee until August 2002, when she "became a qualified ASM." (Pl. 56.1, ¶ 2.)

ASMs are unionized and represented by the Transportation Communications Union (the "TCU"). (Def. 56.1, ¶ 4; Pl. 56.1, ¶ 4.) Their duties include supervising ushers, ensuring proper crewing on trains, ensuring trains leave on schedule, ensuring customer and employee safety, and making announcements. (Def. 56.1, ¶ 3; Pl. 56.1, ¶ 3.) According to an organizational chart provided by plaintiff, there are approximately 20 ASMs, all of whom report to the General Stationmaster (the "GSM"). (Zabell Declaration, Ex. 4.) The GSM, in turn, reports to the General Superintendent - Terminal Operations. (*Id.*, Exs. 4, 5.)

When plaintiff became an ASM, the GSM was a man named James
Burns. (Def. 56.1, ¶ 5; Pl. 56.1, ¶ 5.) Burns retired three or four
years later, in June 2005. (Def. 56.1, ¶ 6; Pl. 56.1, ¶ 6.)
According to plaintiff, she was approached by Kenneth Walther, then
the Superintendent of Penn Station, and asked if she would consider
applying for Burns' position. (Transcript of Plaintiff's Oct. 25,
2013, Deposition ("Pl. Dep. I") (attached to the McCaffrey
Declaration as Exhibit A), pp. 24-25.) Plaintiff, who was newly
married, nine-months pregnant and unfamiliar with the GSM's duties,
declined to do so. (*Id.*, p. 25-26.)

Burns was replaced by another man, Lachlan Cameron, who
became GSM in late July 2005. (Def. 56.1, ¶¶ 8-9; Pl. 56.1, ¶¶ 8-9.)
Walther appointed plaintiff as his assistant. (Pl. Dep. I, p. 30.)
Among the tasks which she performed in that capacity was management
of the "ASM Board"— essentially, the work schedule for all the ASMs.
(*Id.*, pp. 31-32, 46.)

Even though each ASM bid on and "owned a job," the GSM had
authority to reassign the ASMs as needed. (*Id.*, pp. 34-35.) Cameron
"would utilize seniority ... the best he could" in making
assignments, but he would not assign an ASM to a job that he or she
could not handle. (*Id.*, p. 35.) Although this did not happen
frequently, plaintiff recalled an instance in 2007 or 2008 which an
ASM Barrett was removed from the "extra list" and placed on a "relief
job" because Cameron thought that Barrett was "having a hard time

managing his schedule ...." (*Id.*, pp. 36-37.) Plaintiff also recalled that Barrett, who "owned" the position on the extra list and who had not requested the transfer, called Cameron to express displeasure. (*Id.*, pp. 36, 38.)

Cameron retired effective December 1, 2008 (Def. 56.1, ¶ 25; Pl. 56.1, ¶ 25), and plaintiff became Acting GSM. (Pl. Dep. I, p. 48.) In that capacity, she attended a meeting with Vincent Campasano, who was soon to become General Superintendent - Terminal Operations. Prior to the meeting, she and others made jokes which offended Campasano. (Pl. Dep. I, pp. 56-57.) After the meeting, Campasano telephoned plaintiff, complained that she "didn't show him any respect" and "semi-implied" that she would not be considered for the GSM position because her husband, another LIRR employee, had a disciplinary record. (*Id.*) Although plaintiff did not know if Campasano called other attendees as well, (*id.*, p. 69,) she testified that she was subsequently told by Williams Gibbons, then the General Superintendent of Penn Station and the head of her department, not to joke with Campasano until after she was awarded the GSM position. (*Id.*, pp. 56-57.)

On February 1, 2009, the MTA's Office of the Inspector General (the "IG") received an anonymous complaint regarding the manner in which plaintiff was scheduling the ASMs. The complaint, a copy of which is included in Exhibit T to the McCaffrey Declaration, alleged that plaintiff was "racially targeting and providing Overtime

4

for some of her closest friends/employees," rather than following the "union work rule" of awarding overtime based on seniority. The complaint further alleged that the ASM Board was never filled out until "Friday after everyone has done the assigned shifts or is [*sic*] to[o] late to change anything." (McCaffrey Declaration, Ex. T.) Copies of the complaint were sent to Campasano, Gibbons and Rod Brooks, the Chief Transportation Officer. (*Id.*)

On February 11, 2009, Helen E. Williams, the President of the LIRR, referred the complaint to Brooks; S.M. Drayzen, the Vice President of Labor Relations; and others for a response. (*Id.*) That same day, plaintiff was promoted to GSM. (Def. 56.1, ¶ 30; Pl. 56.1, ¶ 30.) That promotion, however, ended up costing her almost $30,000 per year. (Transcript of plaintiff's Jan. 2, 2014, Deposition ("Pl. Dep. II") (attached to the McCaffrey Declaration as Exhibit B), p. 164.) Prior to the promotion, plaintiff's base salary was $78,927.68 (Def. 56.1, ¶ 29; Pl. 56.1, ¶ 29), but she was also paid four overtime hours each day to compensate for her work as Acting GSM. (Pl. Dep. I, p. 48.) As a result, she was actually earning over $118,000 per year. (Zabell Declaration, Ex. 2; Affidavit of Charmaine Fraser in Opposition to defendant's Motion for Summary Judgment ("Plaintiff's Affidavit"), ¶ 1.) When she was promoted, her salary increased to $93,000, but the position was "Non-Represented" and, accordingly, she was no longer eligible for overtime. (Zabell Declaration, Exs. 2 & 5.)

Plaintiff was aware that Cameron's salary upon his retirement had been $95,982, and requested that she receive the same salary. (Zabell Declaration, Ex. 1, p. 9.) According to a memorandum which plaintiff sent to Raymond P. Kenny, LIRR's Senior Vice President of Operations, on April 21, 2010, and which is attached to the Zabell Declaration as Exhibit 1 (hereafter, the "April 2010 Memorandum"), she met with Campasano, who represented that Cameron's last paycheck included compensation for unused vacation days, that increasing plaintiff's salary would necessitate increasing other salaries, and that Brooks did not approve the increase. (*Id.*) Plaintiff claims that she subsequently spoke with Cameron and Brooks, who contradicted two of Campasano's three stated reasons. (*Id.*)

Following her promotion, plaintiff, who was only 30, received some "push back" from ASMs and unsuccessful applicants for the GSM position. For example, an engineer told plaintiff that he overheard Liam Clampett—a Transportation Manager who unsuccessfully applied for the GSM position—complain that plaintiff "only got the job because of who she is and what she is." (Pl. Dep. I, pp. 51-52.) One of the ASMs, a Mr. Teresky, left the department after plaintiff denied his application for an additional meal period, stating that "no little black girl was going to tell him what to do." (*Id.*, pp. 127-28.) Teresky further stated that plaintiff had been promoted only because another woman, Judith Issan, did not want the job.

(*Id.*, p. 128.) Plaintiff never complained about Teresky's conduct. (*Id.*, p. 129.)

In the months following plaintiff's promotion, the Transportation Department conducted an investigation into the anonymous complaint against plaintiff. That investigation, which was described in a memorandum prepared by Drayzen in May 2010 (McCaffrey Declaration, Ex, U), ultimately determined that plaintiff had not engaged in any wrongdoing. However, the investigation determined that there was no set procedure for selecting which employees received overtime assignments and "weaknesses . . . in general administrative record keeping" relating to these assignments. (*Id.*)

***The Transfer of the ASM Board***

On February 23, 2010, plaintiff had a meeting with Brooks, in which the Chief Transportation Officer proposed transferring the ASM Board to the Crew Dispatcher (also called the Crew Management Office or Manpower Office), who handled the scheduling of most other LIRR employees. According to plaintiff's April 2010 Memorandum, Brooks thought that the computer system used by the Crew Dispatcher would "remove the human factor" in scheduling the ASMs. (Zabell Declaration, Ex. 1, p. 11.) He told plaintiff to do "due diligence" with Labor Relations on whether or not the computerized system would work. (*Id.*) Plaintiff told Brooks that she "already had things in order" and was concerned that "the Manpower office would not be able to provide the same amount of oversight" as plaintiff gave to the scheduling of ASMs. (*Id.*)

Plaintiff's April 2010 Memorandum details some of the steps she took after her meeting with Brooks.  Among other things, plaintiff had a meeting with her direct supervisor, Campasano, and Barry Kaufman, the person investigating the anonymous complaint, in which Campasano allegedly became "agitated" with plaintiff.  (*Id.*, p. 12.)  Plaintiff then spoke with a person in the Information Technology ("IT") department who was familiar with the Crew Dispatcher's computer system and who told her that the system could be loaded onto her computer.  (*Id.*)  She also spoke with a person in Labor Relations, who told her that the Crew Dispatcher did not consider the operation of the computer system to be "owned work." (*Id.*)

During the week of March 8, 2010, plaintiff had a conversation with Gibbons, who asked her if she had asked "IT" about the computer system and whether it could be loaded onto her computer. (*Id.*)  When plaintiff responded in the affirmative, Gibbons informed her that Campasano had learned of these developments upon his return from vacation and demanded to know who had given plaintiff the authority to do that.  (*Id.*, p. 13.)  Plaintiff then "expressed [her] displeasure . . . with such statements coming from . . . Campasano," saying that she was "tasked with finding efficient ways to run" her department and asking, "If using this program can do it, what is the issue."  (*Id.*)

On March 21, 2010, plaintiff sent Brooks a document in which she recounted her discussions with IT and the Labor Department and proposed that she retain the responsibility for scheduling the ASMs. (*Id.*, p. 13.) She also recounted a March 10, 2010, conversation with the Manpower Office, which allegedly told plaintiff that the office was "not equipped or able to handle the ASM [B]oard." (*Id.*) However, in an email dated March 22, 2010, Brooks rejected her proposal, stating:

> I've already committed to both the IG and the President's office that this work would be transferred to the Crew Dispatcher. I understand the proposal, but I still feel strongly that this is the way to go. The organization is under significant pressure to be transparent without raising costs; this gives clerical work to clerical people and frees the manager up to manage. Again, I understand your passion, but I've given my word and still feel that it is better off being handled by the crew dispatcher.

(McCaffrey Declaration, Ex. S.)

Notwithstanding this email, plaintiff continued to press her case to retain control over the ASM Board. On April 21, 2010, she sent the April 2010 Memorandum, some of the contents of which have been discussed above. In that memorandum, entitled "My reasons for concern," plaintiff discussed Campasano's telephone call to her regarding her joke, her unsuccessful request to start at Cameron's ending salary, the slighting comments made about her by Clampett and other employees, and the anonymous, discredited complaint that she had engaged in favoritism. However, more than half of the memorandum related to the decision to transfer the ASM Board. Plaintiff claimed

that this transfer created the perception, which she shared "a little," that she was "being pushed out or prepared for abolishment." (Zabell Declaration, Ex. 1, p. 16.)  Although she did not specifically allege that the transfer of the ASM Board was due to her gender, she noted that she was the first woman to hold the GSM position and claimed that, in her dealings with Campasano, she perceived that he had "an issue when it comes to females."  (*Id.*)

On July 12, 2010, plaintiff had another meeting with Brooks, in which he agreed to "take another look" at the decision to transfer the ASM Board.  (McCaffrey Declaration, Ex. V.)  In an email which plaintiff sent to Brooks following the meeting, plaintiff tacitly acknowledged that she had bypassed her immediate supervisor by stating: "I do believe in the chain of command, however in this case I felt that I would not be heard."  (*Id.*)  In his response to her email, Brooks did not criticize plaintiff for bypassing her supervisor, but complimented her, stating: "[Y]our tenacity is amazing and you definitely are passionate about your work."  (*Id.*)

By late January 2011, however, Brooks was beginning to lose patience with plaintiff.  On January 24, 2011, plaintiff sent Brooks an email noting that the transfer of the ASM Board to the Crew Dispatcher would not accomplish his goal of ensuring that the ASMs assignments would not be determined by any one individual. (McCaffrey Declaration, Ex. QQ, p. 2.)  In his response, Brooks did not specifically address this argument, stating, in pertinent part:

> I am not willing to re-litigate this issue; we
> have studied and worked on this issue for nearly

>            a year or more.  I've heard the arguments, both
>            pro and con, and have made the decision to move
>            the dispatching of ASMs to the Crew Management
>            Office based upon ... a consideration of the
>            benefits and risks.  I expect that, now that the
>            decision is made, every manager will do
>            everything in their power to ensure its success.

(*Id.*, p. 1.)

At some point, plaintiff became aware that she had been
excluded from meetings relating to the transfer of the ASM Board.  At
first, plaintiff testified that she knew "for sure" of only two such
meetings, both of which had been organized by Campasano, who was then
the General Superintendent in Jamaica, Queens, and responsible for
the Crew Dispatcher's Office.  (Pl. Dep. II, pp. 51-52.)  However,
plaintiff was not sure when the meetings occurred or who attended
them.  (*Id.*, p. 51.)  She thought that the first meeting involved the
union, which approached Campasano directly, and several represented
"stationmasters" — presumably, ASMs.  (*Id.*, pp. 51-53.)  Plaintiff
believed that Campasano should have notified her because the ASMs
were in her department, and theorized that Campasano had deliberately
failed to do so because of her gender.  (*Id.*)  Plaintiff conceded
that Campasano never mentioned her gender, but noted that Cameron had
been alerted to similar meetings in the past.  (*Id.*, pp. 52-53.)

Plaintiff knew little about the second meeting, except that
Sprio Papanikolatos, then the General Superintendent - Terminal
Operations, had been invited to attend.  (*Id.*, p. 51.)  When he
became unavailable, he asked a lead manager to appear in his stead.

11

(*Id.*)  The lead manager then called plaintiff to ask what to discuss at the meeting.  (*Id.*)  Plaintiff knew nothing about the meeting or what was discussed at it, although she claimed to know that  it had "to do with the [B]oard and the crew dispatcher's office."  (*Id.*, pp. 56-57.)

Later, plaintiff recalled two other meetings which she did not attend.  One was held on April 7, 2011, "to discuss [that] station ops dispatchers will dispatch ASMs by April 13th and no later."  (Pl. Dep. II, p. 59.)  According to plaintiff, that meeting was organized by Campasano and attended by three of his subordinates: Barry Kaufman, who did "budgetary stuff and numbers," and two persons who were in charge of the Crew Management Office.  (*Id.*, pp. 59-60.) Plaintiff conceded that no one else from her department was invited to that meeting.  (*Id.*, p. 60.)

The other meeting was between ASM Teresky and Michael Catok, who was employed in the Crew Management Office as a Superintendent Advisor.  (*Id.*, p. 62.)  According to plaintiff, the two discussed "[h]ow the [B]oard works" and "what do they do in different instances."  (*Id.*, p. 62.)  Plaintiff implied that she would not have attended the meeting even if she had been invited, saying, "It was a meeting that shouldn't have taken place."  (*Id.*, p. 63.)

Although plaintiff testified that unnamed individuals informed her of other meetings to which she was not invited (*id.*, p.

61), plaintiff did not offer any specific information relating to those meetings. Indeed, she could not even recall the dates on which the alleged meetings occurred. (*Id.*, p. 62.) In contrast, plaintiff admitted that she was invited to at least five meetings relating to the transfer of the ASM Board: a January 10, 2011, meeting to "discuss any CBA related issues" arising by virtue of the transfer; a January 24, 2011, meeting to outline how the Crew Management Office would dispatch the ASMs; a February 3, 2011, meeting to discuss dispatching ASMs; a February 17, 2011, meeting to discuss rules for dispatching ASMs and a March 24, 2011, meeting to "discuss ASM crew board finalization." (*Id.*, pp. 58-59.)

Plaintiff testified that she complained to Brooks, Gibbons, Kenney and Michael Gellormino—a Vice President of Transportation Services—about her exclusion from meetings. (*Id.*, pp. 81-82.) When news of her complaint reached Campasano, he became "very irritated," reportedly sending Gibbons an email in which he stated that he did not work for plaintiff and would not answer to her. (*Id.*, p. 104.) Plaintiff herself attributed Campasano's reaction to the fact that he did not like his decisions questioned, and did not like subordinates to "go around him" or to "say anything without his permission." *Id.*

Although plaintiff did not recall telling either Brooks or Kenny that she had been excluded because of her gender, she claimed that she made this assertion to Gelamino. (*Id.*, pp. 81-82.) However, she did not meet with Gelamino until January 2012 — more than six

13

months after Campasano announced the new system for dispatching ASMs in a memo dated May 6, 2011. (*Id.*, p. 82; McCaffrey Declaration, Ex. X.) Moreover, plaintiff's two meetings with Gelamino were not exclusively, or even primarily, about her exclusion from meetings. (Pl. Dep. II, p. 83.) Rather, the meetings principally addressed issues relating to the appointment of ASM Barrett as Assistant General Stationmaster. (*Id.*)

### The Appointment of ASM Barrett as Plaintiff's Assistant

When plaintiff first became GSM, the Assistant GSM was classified as a "special assignment" and was selected by the GSM, without regard to seniority. (*Id.*, p. 90.) Plaintiff first appointed Steven Barry and, later, Joanne Sloane. (*Id.*, p. 92.) Sometime thereafter, the union raised an issue about plaintiff assigning a represented ASM to substitute for her at management meetings. (*Id.*, p. 96.) The TCU apparently insisted that Sloane be compensated for her out-of-classification work or that the GSM's assistant be reclassified in a way which would have resulted in the assistant being placed at the bottom of the seniority list for purposes of overtime. (*Id.*, pp. 93-97.)

The LIRR ultimately determined that it was a violation of the collective bargaining agreement for Sloane to attend management meetings and Gibbons told plaintiff to discontinue the longstanding practice of having the assistant substitute if the GSM was unavailable. (*Id.*, pp. 98-99.) At her deposition, plaintiff opined

14

that the LIRR may not have fought the union on this point because of plaintiff's gender, but also conceded: "Maybe there was nothing to fight on." (*Id.*, p. 100.)

At some point, the union argued that the Assistant GSM position should be eliminated as unnecessary. In a heated exchange, William DeCarlo—a low-level LIRR employee who was attending the meeting in his capacity as a union representative — accused plaintiff and her assistant of doing nothing but "painting each other's toenails." (*Id.*, p. 101-02.) Plaintiff was rendered speechless "that a union representative . . . would say that to [her] as a female, as a manager" and expected one of the management attendees, which included her supervisor, to stop him or correct him. (*Id.*, p. 102.) No one did anything. (*Id.*)

Although the Assistant GSM position was not eliminated, the LIRR ultimately agreed to have the position filled by the Crew Management Office, based on seniority. (*Id.*, p. 92.) As a result, when Sloane retired in 2011, plaintiff could not pick her successor. (*Id.*) Rather, the position was awarded to the applicant with the most seniority: ASM Zekeisha Barrett. (*Id.*, p. 105.)

Plaintiff had a history of conflicts with Barrett, whom plaintiff had accused of physically threatening her in July 2010. (*Id.*, p. 86.) Those allegations had been investigated, but were determined to be unsubstantiated. (*Id.*, p. 87.) Plaintiff was unhappy about Barrett's appointment and met with Gelamino twice to

express her concerns.  (*Id.*, p. 83.)  Gelamino, who did not take any notes during the meetings, did not take any action to address plaintiff's concerns.  (*Id.*, pp. 83-84.)

### *The Incidents in December 2011 and January 2012*

On December 21, 2011—about one month after assuming the post of Assistant GSM— Barrett called Alphonse Legene, a Transportation Manager at Penn Station, and complained that plaintiff had yelled at her, then hung up on her, during a telephone conversation earlier that day.  (*Id.*, p. 109; McCaffrey Declaration, Ex. CC.)  Barrett also claimed that a third-party, Suzanne Clark, had overheard the exchange, and that plaintiff was subjecting her to a hostile work environment.  (McCaffrey Declaration, Ex. CC, p. 2.)  Campasano, the General Superintendent of Terminal Operations, directed Barrett to appear at the Trial Office to give a statement regarding the incident.  (*Id.*)

On December 29, 2011, Barrett appeared in the Trial Office and gave a statement before a Trial Officer Joe Mutone and a union officer.  She claimed that the incident began after the acting Superintendent of Penn Station, Joe Navarro, directed her to supervise the cleaning of the Stationmaster's Office, a task which plaintiff had earlier assigned to another ASM, Daryle Ware, who was the Assistant GSM during an earlier shift.  (McCaffrey Declaration, Ex. DD, p. 335.)  Later that day, plaintiff telephoned Barrett and yelled at her for following Navarro's directions, rather than

plaintiff's orders. (*Id.*, p. 337.) Plaintiff instructed Barrett to speak to Ware, determine what he wanted cleaned, and to ensure that the cleaning was done. According to Barrett, plaintiff told her "to make sure that every dust bunny is outside that office, [even] if you have to get on your knees ...." (*Id.*) When Barrett complained that plaintiff was "talking ... in a very aggressive way," plaintiff allegedly responded that she did not care about Barrett's feelings and hung up on her. (*Id.*)

Clark, a Secretarial Clerk employed by Campasano, had testified before the same Trial Officer on December 27, 2011, and corroborated most of Barrett's testimony. She testified that she heard plaintiff screaming at Barrett about not following her assignments, and Barrett calmly complaining about plaintiff yelling at her. (McCaffrey Declaration, Ex. EE, p. 321.) Barrett remained calm as plaintiff screamed at her about checking for "dust bunnies" but, after three minutes, began "getting a little upset ...." (*Id.*, p. 322.) Barrett then accused plaintiff of creating a "hostile work environment," prompting plaintiff to hang up on her. (*Id.*)

During her testimony before the Trial Office, plaintiff claimed that the conversation had become loud only after Barrett began yelling at her, and that the conversation was never "hostile." (McCaffrey Declaration, Ex. GG, p. 82.) Plaintiff denied having asked Barrett to check for dust bunnies, asserting that she had said

that Ware knew where every dust bunny was because he worked in the Stationmaster's office every day.  (*Id.*)

On January 5, 2012, about two weeks after the incident with Barrett, Arthur Maratea, National Vice President of the TCU, wrote Brooks a letter alleging that other ASMs were also feeling threatened by plaintiff.  (McCaffrey Declaration, Ex. HH.)  Without specifying any of the ASMs by name, Maratea asserted that ASMs had "been spoken to in a very unprofessional manner in the past as well as in the present," and had contacted the union for assistance.  (*Id.*)  He also alleged that plaintiff had "blatantly violated" some agreements that the union had reached with management, such as "the vacation understanding."  (*Id.*)  Maratea requested a meeting "to rectify this situation so [union] members may do their job and not feel threatened in a hostile work environment."  (*Id.*)

On January 11, 2012, there was another incident. Plaintiff, who was taking classes during the day to qualify as a conductor, had interviewed ASM applicants, chosen two candidates, and requested that Human Resources contact them with offers.  (Pl. Dep. II, p. 122.)  One candidate subsequently called plaintiff to say that he was starting the next day and to ask what books and other things he needed to bring.  (*Id.*)  Plaintiff expected that she would have been alerted by Human Resources if there were any problems with either candidate (*id.*, p. 124), and therefore assumed that an offer had also been extended to the other candidate: Paul Lieui.  Although

plaintiff denied that she told Lieui he had been awarded the job (*id.*, p. 123), she admitted calling him with information regarding when and where to report, not knowing that the LIRR office in which he then worked had decided to hold him until March. (*Id.*, p. 125.) At her deposition, plaintiff acknowledged that Human Resources was responsible for extending offers on behalf of LIRR, but noted that her violation of this rule was unintentional. (*Id.*, p. 123.) In support of its motion, defendant has submitted a Declaration from the LIRR's Senior Director of Human Resources, who states that "[p]laintiff's interference" in the hiring process "was a serious breach of LIRR policies that created confusion and discord." (Meilick Declaration at p. 6.)

### *The Charge of Discrimination*

On January 27, 2012, plaintiff filed a charge of discrimination (the "Charge") with the New York State Division of Human Rights (the "SDHR"), alleging that she had been discriminated against by Barrett, Campasano, Brooks and the General Superintendent of Transportation, Spiro Papanikolatos. (Zabell Declaration, Ex. 15, p. 3; McCaffrey Declaration, Ex. II, p. 3.) The Charge consisted of a completed form (the "Form") and a four-page narrative (hereafter, the "Narrative"). The first page of the Narrative stated that plaintiff was attaching a copy of the April 2010 Memorandum, which is discussed on pages 9-10, *ante*.

The Narrative principally complained about the transfer of the ASM Board and the elimination of her "right to choose [her] assistant."  However, the Narrative also touched on other incidents in which plaintiff felt that her authority had been undercut. Plaintiff alleged, *inter alia*, that her ability to approve or deny compensatory time for ASMs had been taken away and that her attempts to discipline a subordinate — an usher and union representative named Edward Baum — were frustrated by Papanikolatos because he was afraid of alienating the union.

The Narrative also implied that Campasano had subjected her to a hostile work environment.  She principally asserted that Campasano told her that she "didn't have a choice" but to accept Barrett as her assistant, and failed to support her when Barrett disregarded plaintiff's instructions.  Instead, Campasano relieved her of her duties, and sent her to the Trial Office to give a statement of facts.  (Narrative, pp. 2-3.)  In addition, the Narrative alleged that Campasano and others did nothing to prevent 4½ days of plaintiff's comp time from expiring.  (*Id.*, p. 2.) Plaintiff's Narrative also recounted an incident in which Papanikolatos's son allegedly told plaintiff's 12-year-old daughter that his father "tortures" plaintiff at work.  (*Id.*)  Plaintiff expressed the belief that forcing her to work with Barrett constituted the "torture."  (*Id.*)

The Narrative did not, however, allege facts to suggest that the "torture" was attributable to gender-based animus. To the contrary, the Narrative stated that Campasano refused to support her in her effort to replace Barrett because she "refused to set a poor picture of a previous ASM . . . ." (*Id*., p. 3.) In addition, the Narrative alleged that Gibbons told her that she was "probably the first General Stationmaster to hold the [ASMs] accountable and they didn't like it," and that Brooks told her that "things are difficult for people when they are 'change agents.'" (*Id*., pp. 3-4.) Indeed, at her deposition, plaintiff admitted that she had never heard Campasano or Gibbons say anything indicative of gender bias. (Pl. Dep. II, p. 103.)

To be sure, the Charge asserts discrimination based on protected characteristics. However, the Charge also makes it clear that plaintiff did not know which of her characteristics occasioned the discrimination. The Form contains a page which lists various types for discrimination and asks the complainant to check boxes to indicate the type of discrimination alleged. Plaintiff checked boxes to indicate discrimination based on age, race, sex and "familial status," based on the allegation that Papanikolatos's son "harassed" plaintiff's daughter at school. In addition, the Narrative notes that plaintiff is the first woman and the second African-American to hold the GSM position, and that she performed many of the GSM's tasks in her role as assistant to Cameron. (Narrative, p. 3.) Plaintiff

asserts that "it is because of [her] gender and [her] race that all of a sudden, the work that [she] did under the cloak of Mr. Cameron was some how now not right." (*Id.*)

### Plaintiff's Reassignment

On April 24, 2012 — about three months after plaintiff filed her Charge — Brooks sent plaintiff a letter informing her that she was being reassigned to the position of "Manager Hours of Service" in the Transportation Services Department. (McCaffrey Declaration, Ex. KK.) Plaintiff retained the same annual salary. (*Id.*) However, according to organizational charts attached to the Zabell Declaration as Exhibit 4, plaintiff no longer had any subordinates and no longer reported directly to a General Superintendent. Rather, she reported to the Senior Manager - Transportation Services Support, who reported to the General Superintendent - Transportation Services Support.

Brooks' letter asserted that plaintiff's "performance, behavior and leadership skills" had been "less than acceptable" for the GSM position and provided five "examples of the problems" experienced during her tenure. First, he stated that plaintiff had "violated corporate policy and confidentiality" by contacting Lieui on January 11, 2012. Second, referencing Maratea's January 5, 2012, letter, he noted that the TCU had complained to upper management about plaintiff speaking to subordinates in an unprofessional manner. Third, Brooks accused plaintiff of violating "LIRR's core values" by

yelling at Barrett and telling her to disregard another manager's directions.

The fourth and fifth examples both related to plaintiff's behavior regarding the transfer of the ASM Board. Brooks charged that she had resisted the transfer even though more senior managers requested that she stop, thereby making the transition more difficult for all concerned. He also charged that in mid-July 2011, plaintiff had involved herself in the dispatching of ASMs, even after being told by senior managers to desist, and had complained about the decision to transfer the ASM Board at meetings and in public.

Brooks not only transferred plaintiff, but placed her on a "Performance Improvement Plan" ("PIP"). Under the PIP, plaintiff was to be given specific goals, with her performance to be monitored and assessed in six months. She was directed to report to the Senior Manager - Transportation Services Support on April 25, 2012, to begin her new assignment.

**Events after Reassignment**

When plaintiff reported to the Jamaica Control Center on April 25, 2012, she was assigned a cubicle because there were no offices available. (Pl. Dep. II, p. 139.) However, one of the offices was assigned to a Joseph Grippaldi, whose position had fewer

"Hay Points" than plaintiff's.[1]  (*Id.*, p. 140.)  Aware that offices

were to be assigned based on Hay Point level, she spoke to her

supervisor, Ed Indelicati, about the situation.  (*Id.*, pp. 140-41.)

He said that he would look into it, but that Papanikolatos would make

the decision regarding what to do.  (*Id.*, p. 141.)

        A month or so later, Indelicati revisited the issue.  He

agreed that plaintiff was entitled to Grippaldi's office, but told

plaintiff that Grippaldi had been rejected for a promotion and that

management did not "really want to hurt his feelings" by forcing him

to move.  (*Id.*, p. 142.)  At her deposition, plaintiff herself stated

that she did not know whether the refusal to move Grippaldi was due

to gender discrimination.  (*Id.*, p. 143.)  She also implied that the

refusal constituted retaliation, stating that her lawsuit was

"already well-known."  (*Id*.)  In fact, this lawsuit was not commenced

until late November 2012.

        At some point thereafter, plaintiff was assigned an office

in the Hillside Support Facility in Jamaica.  (*Id.*, p. 146.)

According to plaintiff, the office was "filthy," with "dust and

papers and dead plants and all types of things all over the office."

(*Id.*)  Plaintiff's supervisor offered to help clean it, but plaintiff

"objected to cleaning an office in that state."  (*Id.*, p. 147.)

---

[1]The LIRR utilizes the Hay Job Evaluation System, in which "Hay
points" are assigned to a position "based on its accountabilities,
know-how, and problem-solving skills."  (Meilick Declaration at 3.)

After plaintiff rejected the first office, she was "given another space and told to order things for that room." (*Id.*) However, that space was to be created by cutting a larger room in half. (*Id.*)  At the time of her January 2, 2014, deposition, plaintiff was still waiting for the construction to be completed. (*Id.*)  However, by that time, there was an open office in the Jamaica Control Center which had been vacant for at least six or seven months. (*Id.*, p. 146.)

Following her reassignment, plaintiff applied for positions as a Superintendent, a Lead Transportation Manager, and a Manager of Terminal Operations and Customer Service. (*Id.*, p. 161.)  The record does not contain evidence of when plaintiff applied for the Superintendent position or why she was rejected.  However, there is documentary evidence that plaintiff was informed that she was ineligible for the Lead Transportation Manager position because she applied within a year of her reassignment and was still on a PIP. (*Id.*, 161-62; McCaffrey Declaration, Ex. OO.)  Plaintiff also was not hired as the Manager of Customer Service and Terminal Operations, a job which resembled the GSM position in that it included, *inter alia*, supervision of ASMs.  (Pl. Dep. II, pp. 152-53.)  Plaintiff may have made inquiries about returning to work as an ASM, but she never actually applied for an open position.  (*Id.*, p. 158.)

At her January 2, 2014, deposition, plaintiff implied that she should have received a raise after April 24, 2012—the day she

qualified as a conductor. (*Id.*, pp. 143, 160.) However, plaintiff did not know of anyone else who had been given a raise in similar circumstances, since transportation managers are generally already qualified as conductors. (*Id.*)

### *The Instant Action*

On November 21, 2012, plaintiff commenced this action against the LIRR, alleging discrimination on the basis of gender and retaliation. The original complaint (the "Complaint") alleged six causes of action. The first three causes of action alleged gender discrimination in violation of Title VII , the NYSHRL, and the NYCHRL, respectively. The next three causes of action alleged retaliation in violation of Title VII, the NYSHRL and the NYCHRL, respectively. The Complaint sought compensatory and punitive damages, along with injunctive relief prohibiting defendant from "engaging in the illegal and unlawful customs, policies, and practices described" in the Complaint. (Complaint, p. 10.)

The three causes of action alleging gender discrimination all specifically alleged that "defendant engaged in a course of conduct" which included "wrongfully transferring plaintiff because of her gender." (Complaint, ¶¶ 37, 42, 47.) The first cause of action, alleging a Title VII violation, alleged that the "course of conduct" also "included treating plaintiff differently than non-female employees." (*Id.*, ¶ 37.) That cause of action did not allude to specific instances of disparate treatment. However, the "Facts"

26

section of the Complaint alleged that plaintiff was "regularly excluded from meetings and conversations concerning her oversight of the schedule for [ASMs]" that Papanikolatos overruled plaintiff's decision to deny compensatory time to certain unnamed workers, and that "plaintiff's male predecessors were not excluded from meetings or overruled on vacation time decisions." (*Id.*, ¶¶ 20, 22-23.)

Although the first three causes of action did not allege hostile work environment, the "Facts" section specifically alleged that "plaintiff was subjected to a hostile work environment," and identified six discriminatory acts which contributed to that environment. (*Id.*, ¶ 19.) In addition to alleging that plaintiff (1) was excluded from meetings and (2) had her decisions regarding compensatory time overruled, the Complaint alleged that she (3) was stripped of responsibility for the ASM Board, (4) had her signature forged by other employees; (5) was reassigned to Manager Hours of Service and placed on a performance improvement plan; and (6) sent to Jamaica and placed in a cubicle, rather than an office. (*Id.*, ¶¶ 20-24, 26-27, 29-34.) The Complaint specifically noted that these events were "an illustrative and not exhaustive list of defendant's discriminatory acts." (*Id.*, p. 3, n.1.)

The three causes of action alleging retaliation specifically alleged that plaintiff "was retaliated against by defendant on the basis of her lawful complaints" to the EEOC and/or SDHR. (*Id.*, ¶¶ 52, 56, 60.) However, the "Facts" section

27

specifically alleged that the ASM Board was transferred in retaliation for plaintiff's complaining about her exclusion from meetings.  (*Id.*, ¶ 21.)

On January 3, 2013, before a responsive pleading was filed, plaintiff filed an Amended Complaint.  This pleading added two new causes of action: one alleging a violation of the Equal Pay Act, 29 U.S.C. § 206(d), and another alleging a violation of New York Labor Law § 194.  These causes of action track the language of the statutes, alleging that the LIRR paid plaintiff "at rates less than the rates at which it pays wages to male employees in the same establishment for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions."  (Amended Complaint, ¶¶ 69, 72.)  However, the "Facts" section of the Amended Complaint contains a paragraph alleging that plaintiff was paid "at a lower rate than the male employees who had held the [GSM] position prior to her," (*id.*, ¶ 18), and a paragraph alleging that Cameron "was compensated at a higher rate than plaintiff, despite plaintiff being equally qualified and experienced."  (*Id.*, ¶ 19.)  This action was transferred to the undersigned judge on February 21, 2018.

**Defendant's Motion for Summary Judgment**

Defendant now moves for summary judgment with respect to most of the causes of action alleged in the Amended Complaint.  Defendant's Memorandum of Law in Support of defendant's Motion for

28

Summary Judgment ("Defendant's Memo") raises five points.  The first point seeks summary judgment with respect to the seventh and eight causes of action, arguing that the difference between Cameron's salary upon retirement from the GSM position and plaintiff's starting salary was attributable to differences in seniority and merit pay. Relying principally on a Declaration of Kathleen M. Meilick, the LIRR's Senior Director of Human Resources, defendant argues that Cameron's salary reflected "three years in the position and a 3% merit raise," and that plaintiff received more, not less, than she should have received under the LIRR's gender neutral Salary Administration policy.  (Defendant's Memo, p. 10.)

The four remaining points seek summary judgment with respect to plaintiff's discrimination and retaliation claims under Title VII and the NYSHRL.  The first of these—Point II—relates solely to plaintiff's discrimination claims arising from the transfer of responsibility for the ASM Board from plaintiff to the Crew Dispatcher.  Defendant argues that this claim is time-barred because more than 300 days elapsed between March 22, 2010, when Brooks informed plaintiff that he had committed to the IG and LIRR's President to transfer the ASM Board, and January 27, 2012, when plaintiff filed her Charge with the SDHR.

The second of these four arguments—Point III—alleges that plaintiff has failed to establish gender discrimination.  Defendant identifies and addresses five discrete acts of discrimination: "(1)

being stripped of her responsibility over ASM assignments; (2) having her authority to approve or deny compensatory time for ASMs circumvented; (3) being denied the opportunity to pick an assistant; (4) being excluded from meetings; [and] (5) being reassigned from her GSM position to Manager Hours of Service." (Defendant's Memo, p. 12.) Defendant then argues that plaintiff has failed to establish a prima facie case of gender discrimination under the first step of the *McDonnell Douglas* analysis because (1) the first four of the five discrete acts do not constitute "adverse employment actions" and (2) none of the five acts occurred under circumstances giving rise to an inference of discrimination. Finally, defendant argues that the record establishes legitimate reasons for the discrete acts and argues that plaintiff cannot establish that these reasons are pretexts for discrimination.

Point IV seeks summary judgment with respect to plaintiff's hostile work environment claim. Defendant argues the actions alleged by plaintiff are not sufficiently severe and pervasive to alter the terms and conditions of plaintiff's employment. In addition, defendant argues that the plaintiff cannot show that the actions are attributable to plaintiff's gender.

Point V relates to plaintiff's Title VII and NYSHRL retaliation claims. Defendant's analysis focuses on four adverse employment actions: (1) the transfer of the ASM Board; (2) plaintiff's reassignment to Manager Hours of Service; (3) plaintiff's

reassignment to a cubicle; and (4) the rejection of plaintiff's applications for other jobs. Defendant's Memo raises specific arguments with respect to each of these four actions, which are discussed below. (Defendant's Memo, pp. 28-30.)

Plaintiff's responses to these argument are also discussed below. However, the court notes that plaintiff's Memorandum of Law Submitted in Opposition to defendant's Motion for Summary Judgment ("Plaintiff's Memo") identifies six discrete acts of discrimination: the five discrete actions identified in Defendant's Memo, plus "being compensated at a lower rate than her male predecessor." (Plaintiff's Memo, p. 9.) In its Reply Memorandum of Law in Further Support of its Motion for Summary Judgment ("Defendant's Reply"), defendant argues, *inter alia*, that plaintiff's claim relating to "pay disparity" was not administratively exhausted because it was not raised in the Charge.

## DISCUSSION

### I. The Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v.*

*Washingtonville Cent. Sch. Dist*., 190 F.3d 1, 5 (2d Cir. 1999)
(internal quotation omitted; brackets added).

Initially, the moving party bears the burden of
demonstrating "the absence of a genuine issue of material fact."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant
meets this burden, the non-movant must then "set forth specific facts
showing that there is a genuine issue for trial."  *Western World Ins.
Co. v. Stack Oil, Inc*., 922 F.2d 118, 121 (2d Cir. 1990) (internal
quotation omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d
Cir. 2009).  "A party may not rely on mere speculation or conjecture
as to the true nature of the facts to overcome a motion for summary
judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)
(internal citation and brackets omitted).  Moreover, a party cannot
sustain its burden in opposing summary judgment by relying on
inadmissible hearsay evidence. *See G.I. Home Developing Corp. v.
Weis*, 499 F. App'x. 87, 90 (2d Cir. 2012) (summary order).

When evaluating a motion for summary judgment, the court
must construe the evidence in the light most favorable to the
non-moving party, drawing all reasonable inferences and resolving all
ambiguities in its favor. *See Niagara Mohawk Power Corp. v. Jones
Chem. Inc*., 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson v.
Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)); *see also Swartz v.
Insogna*, 704 F.3d 105, 109 (2d Cir. 2013).  No genuine triable
factual issue exists when the moving party demonstrates, on the basis

of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and brackets omitted).

## II. *Equal Pay Act*

The first point in Defendant's Memo seeks summary judgment with respect to plaintiff's claims under the Equal Pay Act ("EPA"). The EPA, which is codified in that section of the Fair Labor Standards Act which prescribes the minimum wage to be paid to employees "employed in an enterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 206(a), provides:

> No employer having employees subject to any provisions of this section shall discriminate ... between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions....

29 U.S.C. § 206(d)(1).

"To prove a violation of the EPA, a plaintiff must first establish a *prima facie* case ... by showing: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees

33

perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'" *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)). Some courts have held that in order to make this showing, "the plaintiff must identify a particular 'comparator' for a 'factor by factor' comparison and may not compare himself/herself to a hypothetical or 'composite' member of the opposite sex." *Santiago v. United States*, 107 Fed. Cl. 154, 158 (2012) (citing *Strag v. Bd. of Trs.*, 55 F.3d 943, 948 (4th Cir.1995), and *Moorehead v. United States*, 88 Fed.Cl. 614, 619 (2009)). Although the Second Circuit has yet to "express [an] ... opinion on the merits of such a rule," *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480, 482 (2d Cir. 2001), plaintiff has identified a male comparator: her predecessor, Cameron.

Once a plaintiff has made a prima facie showing, "the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974). Those exceptions provide that the EPA is not violated if the wage differential is attributable "to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex ...." 29

34

U.S.C. § 206(d)(1). "[T]o successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential.'" *Belfi*, 191 F.3d at 136 (citing *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526-27 & n. 1 (2d Cir.1992)); *see EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir. 1988) ("[T]he 'factor other than sex' defense does not include literally any other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.").

If the employer meets its burden, "the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Belfi*, 191 F.3d at 136 (citing *Aldrich*, 963 F.2d at 526). "The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices." *Id.* (quoting *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986)).

In this case, defendant tacitly concedes that plaintiff has established a prima facie case under the EPA. However, defendant suggests that the difference between plaintiff's starting salary and Cameron's ending salary was almost entirely due to the fact that Cameron had been in the position of GSM for three years and had received a 3% merit raise. In addition, defendant notes that

plaintiff was paid more than she was due under the LIRR's gender neutral policy.

In support of these arguments, defendant has provided a Declaration of Kathleen M. Meilick, the LIRR's Senior Director of Human Resources, which details Cameron's earnings history. The Meilick Declaration states that Cameron received a salary of $81,217.76 when he was first promoted to GSM in July 2005. (Meilick Declaration, ¶ 10; McCaffrey Declaration, Ex. E.) He received a 3% general increase at the start of 2006; a 3% merit increase in September 2006; and another 3% general increase at the start of 2007. (Meilick Declaration, ¶¶ 11-16.) As a result, Cameron's annual salary was $88,749.44 as of January 1, 2007. (*Id.*, ¶ 16.) In April 2007, the LIRR reassessed the value of the GSM position, which resulted in an increase in Cameron's salary to $93,186.00. (*Id.*, ¶¶ 19-21.) Cameron received another 3% general increase at the start of 2008, which increased his annual salary to $95,981.60. (*Id.*, ¶¶ 22-23.) He was still earning that salary when he retired effective December 1, 2008. (*Id.*, ¶ 24.)

When she was promoted to GSM in February 2009, plaintiff was offered a starting salary of $93,000. (*Id.*, ¶ 32.) That was almost $12,000 more than Cameron earned when he was promoted to GSM in 2005, but $3,000 less than Cameron was making when he retired after three years in the GSM position. However, by the court's calculation, it was only about $186 less than the $93,186.37 that

36

Cameron would have been earning at his retirement if he had not been awarded the 3% merit increase in September 2006. That minuscule $186 difference in salary—about 2/10ths of one percent—was more than justified by the disparity in seniority and experience between Cameron and plaintiff. Cameron was retiring with over three years of experience in the GSM position, while plaintiff was only 30 years old, with a few months of experience as Acting GSM.

Plaintiff has offered no evidence to show that the differential between plaintiff's starting salary and Cameron's salary upon retirement was not justified by merit and seniority. Rather, plaintiff points out that defendant did not strictly adhere to its "Salary Administration Program for Non-Represented Employees," which is attached to the McCaffrey Declaration at Exhibit G, and that plaintiff had been making over $118,000 prior to her promotion. While plaintiff may be correct, neither of these facts support her contention that she was subjected to discrimination.

First, plaintiff's starting salary was over $5,000 more than she would have received if the LIRR had followed its "Salary Administration Program." Under that Program, a promoted individual generally receives either a 10 percent increase in base salary or 112% of the "midpoint salary" for the new position—a figure determined by assessing the value of the position to the organization. (Meilick Declaration, ¶ 31; McCaffrey Declaration, Ex. G, pp. 4-5 of 12.) However, if that amount is less than 88% of the

"midpoint salary," a department head can request that the salary be increased to 88% of the midpoint. (Meilick Declaration, ¶ 31; McCaffrey Declaration, Ex. G, p. 5 of 12.)

At the time plaintiff applied for Cameron's job, she was an ASM with a base salary of $78,927.68. (Meilick Declaration, ¶ 28.) If her base salary were increased 10%, plaintiff would have received only $86,820. However, the midpoint salary for the GSM position was $99,889 (*see* Zabell Declaration, Ex. 5), and 88% of the midpoint salary was $87,902.32. Therefore, her department head could have requested that her base salary be increased to that amount.

Although Meilick claims that her department "determined plaintiff's salary based on LIRR policy," (Meilick Declaration, ¶ 30), plaintiff's starting salary was clearly not determined based solely on the Salary Administration Program. Plaintiff was offered $93,000—almost $5,100 more than the $87,902.32 to which she was entitled. Though it is unclear how the LIRR reached this determination, the fact that the LIRR paid plaintiff more, not less, than she was entitled to under the Salary Administration Program undercuts an inference of discrimination.

The fact that the $93,000 was over $25,000 less than plaintiff earned the year prior to her promotion is also not evidence of discrimination. As Plaintiff's Memo acknowledges, plaintiff made much more than her $78,927.68 base salary because she was earning overtime for serving as Cameron's assistant. During the period that

38

she served as Acting GSM, plaintiff was earning four overtime hours each day.  (Pl. Dep. I, pp. 48-49.)  However, when she became GSM—a non-represented, or management, position—she was not eligible for overtime.  This, not discrimination, accounted for the precipitous drop in plaintiff's earnings after she became GSM.

## III.   *The Title VII and NYSHRL Claims*

### A.   *The Procedural Issues*

Before addressing the substantive arguments relating to plaintiff's Title VII and NYSHRL claims, the court will address two procedural issues raised in defendant's papers.  First, defendant argues that plaintiff's discrimination claims relating to the transfer of the ASM Board are time-barred because plaintiff did not file her Charge with the EEOC within 300 days of the date the transfer occurred.  Second, defendant argues that plaintiff's discrimination claims relating to pay disparity were not administratively exhausted because they were not raised in the Charge.  Neither argument has merit.

"Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." *Williams v. N.Y.C. Housing Auth*., 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-5).  The purpose of the exhaustion requirement is to permit the EEOC or equivalent state agency an opportunity to resolve the complaint without litigation.  *See Stewart*

*v. U.S. Immigration & Naturalization Serv.*, 762 F.2d 193, 198 (2d Cir. 1985) ("the purpose of the [Title VII] exhaustion requirement ... is to give the administrative agency the opportunity to investigate, mediate, and take remedial action...."). That purpose "would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC," *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 26 (2d Cir. 1985). Consequently, a district court can only "hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of N.Y. Dept., of Housing Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993) (citing cases).

Unexhausted claims are "reasonably related" where (1) "the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;'" (2) the plaintiff is "alleging retaliation by an employer against an employee for filing an EEOC charge;" or (3) "a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Id.* at 1402-03 (citations omitted). "In determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003)

40

(quoting *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002) (brackets added in *Deravin*).

The time period for filing a charge of discrimination varies, depending on whether the individual files his charge directly with the EEOC or with a state or local agency. In New York, which has both state and local fair employment agencies, an individual who initially files a grievance with the state or local agency must file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred," or within 30 days after receiving notice that the state or local agency has terminated the proceeding, whichever is earlier. 42 U.S.C. § 2000e-5(e)(l). If a charge is filed solely with the EEOC, it must be filed within 180 days after the alleged unlawful employment practice occurred. *Id*. A discrete retaliatory or discriminatory act occurs on the day that it happens. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).

In arguing that plaintiff did not timely file a charge of discrimination relating to the transfer of the ASM Board, defendant argues that this allegedly discriminatory act occurred on March 22, 2010 — the date of Brooks' email stating that he had "committed to both the IG and the President's office that [the Board] would be transferred to the Crew Dispatcher." (McCaffrey Declaration, Ex. S.) Although this email advised plaintiff of Brooks' intentions, the responsibility for the ASM Board was not actually transferred to the Crew Dispatcher until sometime in May 2011. (*See* Zabell Declaration,

Ex. 7.)  Defendant has not established that more than 300 days
elapsed between this date and the date plaintiff filed her Charge
with the EEOC.

In its response to plaintiff's claim that defendant
discriminated against her by paying her less than Cameron, defendant
argues that plaintiff failed to administratively exhaust this issue.
(Defendant's Reply, p. 2.)  Although the court agrees that there is
no explicit mention of pay in the Charge itself, the Narrative states
that plaintiff attached to the Charge a copy of her April 2010
Memorandum.  (Narrative, p. 1.)  This memorandum included a complaint
about the LIRR's refusal to pay plaintiff as much as Cameron made
upon his retirement.  (Zabell Declaration, Ex. 1, p. 2.)  These
allegations were sufficient to exhaust plaintiff's disparate pay
claims.

### B.   *The McDonnell Douglas Framework*

Generally, Title VII gender discrimination claims are
analyzed using the familiar burden-shifting framework established in
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Walsh v.
N.Y.C. Housing Auth*., 828 F.3d 70, 74-75 (2d Cir. 2016).  The same
framework is used to analyze gender discrimination claims brought
under the NYSHRL.  *See Pucino v. Verizon Wireless Commc'ns, Inc*., 618
F.3d 112, 117 n. 2 (2d Cir. 2010) ("We review discrimination claims
brought under the NYSHRL according to the same standards that we
apply to Title VII discrimination claims.").  However, City-law

claims brought under NYCHRL are analyzed under a different standard. *See Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 13 (2d Cir. 2013) (summary order) (district court erred in analyzing NYCHRL claim under the same standard as claims under federal and state law). Accordingly, "NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).

Under the *McDonnell Douglas* framework, the plaintiff first must demonstrate by a preponderance of the evidence a prima facie case of discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). "If the plaintiff succeeds, a presumption of discrimination arises," *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005) and "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Walsh*, 828 F.3d at 75 (quoting *United States v. Brennan*, 650 F.3d 65, 93 (2d. Cir. 2011) (internal quotation marks in *Brennan* omitted). "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 804).

To establish a prima facie case of gender discrimination, a plaintiff must demonstrate that "(1) she was within the protected

class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Walsh*., 828 F.3d at 75 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009)). "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." *Id*. (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998). However, a plaintiff must adduce evidence to make out the elements of a prima facie case, and cannot merely rely on "conclusory statements, conjecture, or speculation." *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005) ("'conclusory statements, conjecture, or speculation' are inadequate to defeat a motion for summary judgment.").

In this case, defendant does not contest the fact that plaintiff, as a woman, was a member of a protected class or that she was qualified for the positions she held. Rather, defendant argues that some of the discrete acts of discrimination alleged by plaintiff—the transfer of the ASM Board, the overruling of compensatory time determinations, the exclusion from meetings, and the denial of the opportunity to choose an assistant—were not adverse employment actions. Defendant further argues that plaintiff has not adduced evidence to establish that any of the alleged adverse employment actions occurred under circumstances giving rise to an inference of discrimination.

"An adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)) (emphasis in *Sanders* omitted). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)). "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

"Conversely, '[c]riticism of an employee in the course of evaluating and correcting her work is not, in itself, a materially adverse employment action.'" *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 226 (E.D.N.Y. 2016) (quoting *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 642 (W.D.N.Y. 2014)). "Similarly, 'trivial harms,' 'petty slights or minor annoyances' or 'personality conflicts . . . that generate antipathy and snubbing' do not rise to the level of an adverse employment action." *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587 (W.D.N.Y. 2015) (quoting

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d
Cir. 2011)).  To establish that a reassignment was an adverse
employment action, "the plaintiff must show that the transfer created
a 'materially significant disadvantage.'"  *Galabya*, 202 F.3d at 641
(quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th
Cir. 1994)).

        In order to make out a prima facie case of gender
discrimination, plaintiff must not only establish that defendant
engaged in an adverse employment action, but also that the action
occurred under circumstances giving rise to an inference of gender
discrimination.  An inference of discrimination is often established
by evidence of "actions or remarks made by decisionmakers that could
be viewed as reflecting a discriminatory animus." *Gregory v. Daly*,
243 F.3d 687, 697 (2d Cir. 2001), as amended (Apr. 20, 2001).
However, "there is no unbending or rigid rule about what
circumstances allow an inference of discrimination when there is an
adverse employment decision." *Chertkova v. Connecticut Gen. Life
Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996).  For example, "[a] showing
of disparate treatment— that is, a showing that the employer treated
plaintiff 'less favorably than a similarly situated employee outside
his protected group'—is a recognized method of raising an inference
of discrimination for purposes of making out a *prima facie* case."
*Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)
(quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

A plaintiff relying on disparate treatment evidence "must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39 (internal quotations and citation omitted).

In this case, defendant argues that four of the six discrete acts of alleged gender discrimination identified by plaintiff are not adverse employment actions. Those four discrete acts were (1) being regularly excluded from meetings concerning core components of her job responsibilities; (2) being stripped of her duties to oversee the ASM assignments; (3) being "circumvented" by a male co-worker in awarding compensatory hours and (4) being denied the opportunity to choose her own assistant. Defendant does not argue that plaintiff's reassignment to Manager Hours of Service was not an adverse employment action, but argues that this and the other alleged adverse employment actions did not occur under circumstances giving rise to an inference of discrimination. In addition, defendant argues that it has established legitimate reasons for taking the discrete acts identified by plaintiff, and that plaintiff has not established that any of these reasons were merely pretexts for discrimination.

### C.  *Discrete Acts of Alleged Discrimination*

#### 1.  *Exclusion from Meetings*

Preliminarily, the court notes that in arguing that "exclusion from meetings does not amount to an adverse employment

action," defendant relies on two cases which addressed the question of whether such exclusion constituted retaliation. (Defendant's Memo, p. 14 (citing *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011), and *Hampton v. Diageo N. Am., Inc.*, No. 3:04-CV-346 (PCD), 2008 WL 350630, at *10 (D. Conn. Feb. 7, 2008))). "[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). As the Second Circuit has noted:

> This definition covers a broader range of conduct
> than does the adverse-action standard for claims
> of discrimination under Title VII: "[T]he
> antiretaliation provision, unlike the substantive
> [discrimination] provision, is not limited to
> discriminatory actions that affect the terms and
> conditions of employment."

*Id*. (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 64).

In holding that exclusion from meetings was not an "adverse employment action" for purposes of the plaintiff's retaliation claims, however, both *Mabry* and *Hampton* noted that such exclusion was not a material adverse change in the terms and conditions of the plaintiff's employment. In *Mabry*, the court observed that the plaintiff "continues to maintain his position as the Computer Services Director of NDS, he has not been put on a performance improvement plan and his role and responsibilities have remained

48

largely the same, with the exception that he is now supervised by the
COO, who also supervises the human resources department and
facilities, rather than the Executive Director."  769 F. Supp. 2d at
399.  Similarly, in *Hampton*, the court observed that the exclusion
had not affected "tangible job benefits such as compensation, terms,
conditions or privileges of employment."  2008 WL 350630, at *10.

Although these observations may be *dicta*, the court has
found several other cases which hold that a plaintiff's exclusion
from meetings generally does not rise to the level of "adverse
employment action," as that term is defined in Title VII
discrimination claims.  For example, in *Cotterell v. Gilmore*, 64 F.
Supp. 3d 406 (E.D.N.Y. 2014), Judge Spatt held that a plaintiff's
"exclusion from certain meetings plainly does not rise to an 'adverse
employment action'" where the exclusion did not "affect[] the terms
and conditions of the plaintiff's employment."  *Id*. at 423.
Similarly, in *Watson v. Paulson*, 578 F. Supp. 2d 554 (S.D.N.Y. 2008),
Judge Marrero held that the plaintiff's exclusion from a staff
meeting was not an "adverse employment action" because her "absence
from the meeting did not impact the performance of her duties as a
secretary, nor did it result in any other material change in the
terms and conditions of her employment."  *Id*. at 565.

In this case, plaintiff claims that she was excluded from
four meetings, but offers no evidence to suggest that her exclusion
resulted in a material change in the terms and conditions of her

49

employment.  Plaintiff initially testified that she knew "for sure"
of only two such meetings, but was not aware of exactly when the
meetings occurred or who attended them.  (Pl. Dep. II, pp. 51-52.)
Plaintiff thought that the first meeting involved the union, which
approached Campasano directly, and several represented
"stationmasters" — presumably, ASMs.  (*Id.*, pp. 52-53.)  Plaintiff
believed that Campasano should have invited her because the ASMs were
in her department, but has offered no evidence that her exclusion
from this union meeting affected the performance of her duties.  To
be sure, plaintiff's testimony suggests that she felt slighted by
Campasano's snub, but "petty slights" and "'personality conflicts ...
that generate . . . snubbing' do not rise to the level of an adverse
employment action."  *See Betterson*, 139 F. Supp. 3d at 587.

Plaintiff learned of the second meeting when a lead
manager, who had been asked by Papanikolatos to appear in his stead,
called plaintiff to ask what to discuss at the meeting.  (*Id.*, p.
51.)  Plaintiff knew nothing about the meeting or what was discussed
at it, although she claimed to know it had "to do with the [B]oard
and the crew dispatcher's office."  (*Id.*, pp. 56-57.)  Again,
plaintiff offers no evidence that her exclusion from this union
meeting affected the performance of her duties.

Later in her January 2, 2014, deposition, plaintiff
recalled two other meetings.  One, held on April 7, 2011, was
organized by Campasano, who then headed the Crew Management Office,

and was attended by three people who reported directly to him. (Pl. Dep. II, pp. 59-60.) Plaintiff conceded that no one else from her department was invited to that meeting (*id.*, p. 60), and offered no explanation or evidence as to why she should have been invited to a meeting between Campasano and his subordinates, and why her exclusion was based on her gender.

The other meeting was between ASM Teresky and Michael Catok, who was employed in the Crew Management Office as a Superintendent Advisor. (*Id.*, p. 62.) According to plaintiff, the two discussed "[h]ow the [B]oard works" and "what do they do in different instances." (*Id.*, p. 62.) There is no evidence that plaintiff should have been invited to this meeting and that she was excluded because of her gender. Plaintiff implied that she would not have attended the meeting even if she had been invited, saying, "It was a meeting that shouldn't have taken place." (*Id.*, p. 63.)

Although defendant concedes that plaintiff was "inadvertently excluded from a single meeting," (Defendant's Memo, p. 4), neither party has adduced evidence explaining who attended this meeting and what was discussed. Thus, there is no evidence that exclusion from this meeting prevented plaintiff from performing her duties or affected the terms or conditions of plaintiff's employment. Accordingly, plaintiff has not introduced evidence that her exclusion from meetings rose to the level of an adverse employment action.

Even if plaintiff's exclusion from these meetings
constituted adverse employment action. Plaintiff has not introduced
any evidence to support an inference of discrimination. Plaintiff
asserts that she was "systematically excluded, with no basis, giving
rise to an inference of gender discrimination." (Plaintiff's Memo,
p, 13.) However, as noted above, plaintiff herself maintains that
she was excluded from only four meetings, and offers no proof
regarding the nature of the meeting or why she was excluded.

Plaintiff knew little about the first two meetings aside
from the fact that both were organized by Campasano and that one
involved the union and some ASMs, who were supervised by plaintiff.
(Pl. Dep. II, p. 51.) Although plaintiff testified that Cameron was
always included in meetings involving the union (*id.*, p. 52), she
offered no evidence to suggest that she was excluded from this
meeting because of her gender. Indeed, plaintiff testified that she
never heard Campasano say anything indicating gender bias. (Pl. Dep.
II, p. 103.) Moreover, plaintiff herself knew that Campasano had
taken offense to a joke she told while she was an Acting GSM (Pl.
Dep. I, p. 67), had complained about her talking to IT without
authority (*id.*, p. 60), and had implied that she acted as if he
reported to her, not vice versa. (*Id.* at 104.) These facts suggest
that even if Campasano's exclusion of plaintiff was deliberate, it
was attributable to a personality conflict.

## 2.  *Transfer of the ASM Board*

In arguing that the decision to strip plaintiff of her responsibility for assigning ASMs was not an adverse employment action, defendant characterizes the transfer of the ASM Board as "simply an alteration of job responsibilities." (Defendant's Memo, p. 14.)  In support of that contention, defendant cites to a portion of the Declaration of J. Rod Brooks—the LIRR's Chief Transportation Officer at all times relevant to this action—who describes the GSM's responsibilities and duties as "many and varied." (*See* Declaration of J. Rod Brooks, dated June 19, 2014 (the "Brooks Declaration"), ¶ 21.)  Defendant also cites to *Hayle v. Nassau Health Care Corp.*, No. 08-CV-2396 (DRH)(GRB), 2013 WL 6231164 (E.D.N.Y. Dec. 2, 2013), in which the transfer of a scheduling task from the plaintiff to another clerk was held not to be an adverse employment action in the absence of evidence that her loss of duties was materially adverse to the plaintiff's employment and not simply an alteration of her duties. *Id.*, at *6 (citing *Galabya*, 202 F.3d at 640).

*Galabya* — the case cited in *Hayle* — is one of several Second Circuit cases recognizing that changes in job duties which result in "significantly diminished material responsibilities" can be "adverse employment actions."  *See*, *e.g.*, *Littlejohn v. City of New York*, 795 F.3d 297, 312 n. 10 (2d Cir. 2015); *Terry*, 336 F.3d at 138; *Galabya*, 202 F.3d at 640.  However, plaintiff has not adduced evidence that transfer of the ASM Board significantly diminished her

responsibilities.  To the contrary, statements and documents provided by plaintiff support Brooks' claim that the task of assigning ASMs was just one of the GSM's many responsibilities.

First, plaintiff has introduced a copy of the "Position Posting" for the GSM job, issued in late 2008.  (Zabell Declaration, Ex. 5.)  This document lists the "Responsibilities" of the GSM under eight bullet points, many of which list several tasks.  For example, the third bullet point states that the GSM will not only "Manage all section administrative activities with respect to assignments, prioritization of work, SAFERS," but also "Manage the training of new ASMs and Ushers."  At her October 25, 2013, Deposition, plaintiff conceded: "There are a number of responsibilities listed on that document for the [GSM]."  (Pl. Dep. I, p. 71.)  When asked to list the GSM's responsibilities, her answer to that question consumed over a page of transcript.  (*Id.*, pp. 119-20.)

Although plaintiff asserted that a GSM could not successfully perform other responsibilities without "control of the crew board," (*id.*, p. 71), she implied that prior GSMs had delegated that job to their assistant.  (*Id.*, p. 72.)  Indeed, she testified that she became responsible for the ASM Board as soon as she became Cameron's assistant (*id.*, p. 33), and "managed the ASM board" thereafter.  (*Id.*, p. 46.)  She also testified that this job was not particularly time consuming, stating that it took "maybe an hour, depending [on] how many jobs needed to be filled."  (*Id.*, p. 72.)  In

light of this evidence, no reasonable finder of fact could find that the decision to transfer the responsibility for assigning ASMs from the GSM to the Crew Management Office "significantly diminished" plaintiff's "material responsibilities."

Even assuming that the transfer of the ASM Board significantly diminished plaintiff's material responsibilities, the fact that the transfer occurred during her tenure did not create an inference of gender discrimination. Plaintiff's theory is that because she was the first woman to hold the GSM position, every change in the GSM's responsibilities constitutes disparate treatment and creates an inference of gender discrimination. However, to establish disparate treatment, plaintiff would have to establish that the situation remained the same in all material respects from the time Cameron left the office. *See Graham*, 230 F.3d at 39.

Here, the undisputed facts establish the contrary. Plaintiff admits that the MTA was "doing a lot of budget cuts" at the time the transfer of the ASM Board was proposed, and that the ASMs had the "highest rate of overtime above their base pay." (Pl. Dep. I, p. 93.) Although the excessive overtime was not necessarily a result of the manner in which ASMs were assigned, plaintiff's department was coincidentally one of the only departments in which a single individual still had the authority to make assignments. (*Id.*, p. 94.) Moreover, this assignment process was vulnerable to charges of favoritism, such as the charge leveled against plaintiff in

55

February 2010.  Even though that charge proved unsubstantiated, the court notes that Brooks broached the subject of changing the manner in which ASMs were assigned at a meeting on February 23, 2010. (Zabell Declaration, Ex. 1, p.11.)

While plaintiff did not like Brooks' proposal to transfer the ASM Board and repeatedly sought to change his mind, she admitted that other people could disagree with that opinion.  (Pl. Dep. II, p. 45.)  Plaintiff herself never heard Brooks say anything indicating that his decision to transfer the ASM Board was made because of her gender, or even heard that he had made such statements.  (Pl. Dep. II, p. 46.)  Indeed, when asked to explain her basis for alleging that the decision was based on gender discrimination, plaintiff claimed that other personnel had complained to him that they did not like the fact that plaintiff held her subordinates responsible. (*Id.*, pp. 47-48.)

Even assuming that plaintiff's evidence was sufficient to establish an inference of discrimination, there is no evidence to establish that Brooks' stated reasons for transferring the ASM Board were pretextual.  In an email dated March 22, 2010, Brooks told plaintiff that he had already "committed to both the IG and the President's office that this work would be transferred to the Crew Dispatcher," and explained his reasons:

> The organization is under significant pressure to
> be transparent without raising costs; this gives
> clerical work to clerical people and frees the
> manager up to manage. . . . I've given my word

> and still feel that it is better off being
> handled by the crew dispatcher.

(McCaffrey Declaration, Ex. S.)  While plaintiff has provided evidence to suggest that this decision was mistaken, "evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."  *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625 (MKB), 2013 WL 3968748, at *13 (E.D.N.Y. July 30, 2013) (quoting *Grant v. Roche Diagnostics Corp.*, No. 09-CV-1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011, and *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y.2008)).

### 3. The "Circumvention" of Plaintiff's Decision to Deny Compensatory Hours

Plaintiff's Amended Complaint alleges that in or about July 2011, General Superintendent Papanikolatos "began circumventing plaintiff's authority and authorizing compensatory time for workers that plaintiff had previously denied."  (Amended Complaint, ¶ 28.)  The pleading further alleges that the GSM had the responsibility for approving or denying compensatory time, that Papanikolatos's action made her appear "ineffective," and that Papanikolatos ignored and/or rejected plaintiff's "suggestion" of meditation.  (*Id.*)  Defendant has denied these allegations.  (Answer to Amended Complaint, ¶ 28.)

In his deposition testimony, however, Papanikolatos admitted that he did "circumvent" plaintiff's authority as GSM.  (McCaffrey Declaration, Ex. Z ("Papanikolatos Dep."), p. 74.)  He

remembered only one specific instance, however: an incident in which plaintiff denied time off to an employee named Jennifer Powell. (*Id.*, p. 75.) The union then appealed to Papanikolatos, who reversed plaintiff's decision. (*Id.*) He admitted that he did not speak to plaintiff before doing so, but noted: "I have the right to make that decision and overrule the general station master or anybody else that works for me." (*Id.*, p. 76.)

From this testimony, it appears that what plaintiff characterized as "circumventing [her] authority" was actually Papanikolatos exercising his authority as her superior to overrule her decisions. His actions were tantamount to criticizing or correcting her work, which "is not, in itself, a materially adverse employment action." *Jaeger*, 191 F. Supp. 3d at 226; *Hughes*, 37 F. Supp. 3d at 642. While plaintiff believed that his actions made her appear "ineffective," a "thin-skinned worker's reaction to criticism by a supervisor will not support a claim of ... discrimination unless it is outside the bounds of appropriate supervision ...." *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 214 (E.D.N.Y. 2014). There is no evidence that Papanikolatos's actions exceeded the bounds of appropriate supervision.

Even assuming that the overruling of this one decision could constitute an adverse employment action, plaintiff has adduced no evidence that this action gave rise to an inference of discrimination. Plaintiff cites to no evidence in support of her

58

assertion that Papanikolatos's decision to overrule a GSM's determination regarding an ASM's compensatory time was "unprecendented."  (*See* Plaintiff Memo, p. 15.)  Moreover, Plaintiff has adduced no evidence to establish that Papanikolatos's explanation for his action — namely, that he acted at the union behest — was a pretext for discrimination.

### 4.  *Elimination of the GSM's Ability to Choose an Assistant*

In arguing that changes in the manner in which the Assistant GSM was chosen were not an adverse employment action, defendant relies exclusively on *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75 (E.D.N.Y. 2002), a case in which Muslim employees of a non-profit organization of New York City Fire Department ("NYFD") personnel sued the City of New York and others, alleging a "longstanding pattern" of discrimination against Muslims. The plaintiffs sought to amend their complaint to add a claim for Title VII discrimination predicated on the NYFD's decision to hire a Dr. Adesanya as Muslim chaplain, rather than the plaintiff's preferred candidate.  In holding that the NYFD's decision was not an adverse employment action, Judge Glasser stated:

> [E]ven assuming arguendo that access to a
> chaplain of one's own faith is a "term or
> condition" of employment, the court fails to see
> how the decision to hire Dr. Adesanya instead of
> plaintiffs' preferred candidate . . . in any way
> effects a "material adverse change" in that
> access. . . .  Plaintiffs do, in fact, have
> access to a chaplain of their own faith. . . .
> Plaintiffs' argument amounts to nothing more than
> an allegation that, because they do not like Dr.

> Adesanya, plaintiffs will not seek out his
> counsel, and thus they essentially do not have
> "access" to a chaplain of their faith. This is
> exactly the type of claim courts have frequently
> rejected, because "a plaintiff's purely
> subjective feelings about the events and
> circumstances surrounding the allegedly adverse
> employment action do not control." *Gronne v.*
> *Apple Bank for Sav.*, No. 98-CV-6091, 2000 WL
> 298914, at *5 (E.D.N.Y. Feb.14, 2000) (internal
> quotation marks and citation omitted).

*Islamic Soc'y of Fire Dep't Pers.*, 205 F. Supp. 2d at 84.

Although this case is not exactly on point, the court agrees with defendant that Judge Glasser's analysis is applicable to this case.  The change which plaintiff alleges to be an "adverse employment action" did not deprive plaintiff of an assistant.  Rather, due to the vagaries of the seniority system, the changes resulted in the appointment of Barrett, an ASM with whom plaintiff had a pre-existing personality conflict.  Plaintiff's feelings about Barrett may have made her reluctant to rely on her new assistant and undoubtedly resulted in events—most notably, the December 21, 2011, yelling incident—which may have contributed to Brooks' decision to remove plaintiff from her GSM position.  However, plaintiff's subjective feelings regarding the changes in the manner in which the Assistant GSM position was filled did not render those changes "adverse employment actions."

Even if the change in the manner in which the GSM's Assistant was selected constituted an adverse employment action, there was no evidence that this change occurred under circumstances

giving rise to an inference of discrimination. Plaintiff's theory is that because this change was instituted during her tenure, it must have been on account of her gender. However, this theory ignores the events which prompted defendant to make the change in policy.

By all accounts, the transformation in the Assistant GSM position began after the union objected to Sloane's attending management meetings in plaintiff's stead. Specifically, the TCU objected to having Sloane, an ASM and represented employee, assigned to out-of-classification, management responsibilities without being compensated accordingly. (Declaration of William DeCarlo dated Aug. 4, 2014 ("DeCarlo Declaration"), ¶¶ 30-31; Pl. Dep. II, p. 96.) The LIRR determined that it was indeed a violation of the collective bargaining agreement for Sloane to attend management meetings, prompting Gibbons to tell plaintiff to discontinue the practice of sending the GSM Assistant to such meetings. (Pl. Dep. II, p. 99.)

The LIRR and the union eventually agreed to create a new position—called the "N1 position"—that would assist the GSM directly. (DeCarlo Declaration, ¶ 36; Pl. Dep. II, p. 92.) However, the union insisted that the position be treated like any other ASM position, which meant that the position would be filled based on seniority. (DeCarlo Declaration, ¶ 37; Pl. Dep. II, p. 92.) Although Barrett had a conflict with plaintiff in the past, she nonetheless bid for the job because the schedule suited her. (McCaffrey Declaration, Ex. DD, p. 337; Pl. Dep. II, p. 105.)

It is clear from the foregoing that the change in the manner in which the GSM's assistant was selected was largely a result of the TCU's objections.  Although the practice of sending the GSM's Assistant to management meetings pre-dated plaintiff's promotion to the GSM position, there is no evidence that the union had previously voiced any objections to this practice.  Accordingly, there is also no evidence that the LIRR would have reacted differently if these objections had been raised during the tenure of one of plaintiff's male predecessors.

Plaintiff suggested during her January 2, 2014, deposition that the LIRR may have elected not to fight the union on this issue because of her gender.  (Pl. Dep. II, p. 100.)  However, she not only adduced no proof to support this speculation, but candidly admitted that she did not know if there was any basis for contesting the union's position.  (*Id.*)  Moreover, there is no evidence that fighting with the union would have resulted in better results from plaintiff's perspective.  The only other method suggested in the record that would have permitted plaintiff's chosen assistant to continue to attend management meetings would have resulted in the assistant being moved to the bottom of the seniority list for overtime assignments, making it difficult to attract a talented assistant.  (DeCarlo Declaration, ¶ 33; Pl. Dep. II, p. 94.)  Accordingly, the court cannot find any basis for inferring that the

change in the manner in which the GSM's Assistant was selected was attributable to gender discrimination by defendant.

### 5. *Reassignment to Manager Hours of Service*

Defendant does not argue that plaintiff's reassignment from GSM to Manager Hours of Service was not an adverse employment action. Rather, defendant argues that plaintiff has not adduced any evidence that this adverse employment action occurred under circumstances giving rise to an inference of discrimination. Defendant primarily argues that "[t]here is no evidence that ... Brooks, the official who made the decision to transfer plaintiff, made any statement indicative of gender bias" and that there is no evidence of disparate treatment. (Defendant's Memo, p. 17.) Defendant also argues that "any inference of discrimination with respect to plaintiff's transfer to Manager Hours of Service is further diminished by the fact that the same person who approved her promotion to GSM . . . is the same person who decided to transfer her . . . ." (Defendant's Memo, p. 18.)

In her opposition papers, plaintiff addresses only the second of these two arguments. Plaintiff cites to *Copeland v. Rosen*, 38 F. Supp. 2d 298 (S.D.N.Y. 1999), for the proposition that "[t]he 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case

at hand." *Id*. at 305 (citing *Grady v. Affiliated Cent., Inc*., 130 F.3d 553, 560 (2d Cir. 1997)). However, plaintiff does not then engage in the "fact-intensive inquiry" envisioned by *Copeland*. Rather, plaintiff simply distinguishes the facts of her case from those in *Grady*.

Even assuming, *arguendo*, that plaintiff has established that the "same actor inference" is inapplicable to this case, plaintiff has not pointed to any evidence establishing an inference of gender discrimination. As defendant correctly notes, plaintiff has adduced no evidence that Brooks ever said anything indicative of gender bias. Moreover, there is no proof that plaintiff was treated differently than her male predecessor, who did not create the problems which gave rise to plaintiff's transfer. Accordingly, regardless of whether the "same actor inference" applies, plaintiff has not met her burden of proving by a preponderance of the evidence that her transfer from the GSM position occurred under circumstances giving rise to an inference of discrimination.

Even if plaintiff had met this burden, she did not show that the reasons Brooks gave for her reassignment were pretexts for discrimination. In his letter dated April 24, 2012, Brooks provided five "examples of the problems" that resulted in plaintiff's reassignment. First, he stated that plaintiff had "violated corporate policy and confidentiality" by contacting Lieui on January 11, 2011. (McCaffrey Declaration, Ex. KK.) Second, referencing

Maratea's January 5, 2011, letter, Brooks noted that the TCU had complained to upper management about plaintiff speaking to subordinates in an unprofessional manner. (*Id*.) Third, Brooks accused plaintiff of violating "LIRR's core values" by yelling at Barrett and telling her to disregard another manager's directions. (*Id.*) Fourth, Brooks charged that plaintiff had resisted the transfer of the ASM Board even though more senior managers requested that she cease resisting, thereby making the transition more difficult for all concerned. (*Id.)* Finally, he charged that plaintiff was still involving herself in the dispatching of ASMs in mid-July 2011, even after being told by senior managers to desist, and had complained about the decision to transfer the ASM Board at meetings and in public. (*Id*.)

Plaintiff has not adduced any evidence that these were not legitimate reasons for her transfer or that these were pretexts for discrimination. First, although plaintiff denied that she told Lieui he had been awarded the job (Pl. Dep. II, p. 123), she admitted giving him information regarding when and where to report, not knowing that the office in which he worked had decided to retain him until March. (*Id.*, p. 125.) At her deposition, plaintiff acknowledged that Human Resources was responsible for extending offers on behalf of LIRR, but noted that her violation of this rule was unintentional. (*Id.*, p. 123.) She did not argue that gender discrimination played a part in this incident.

65

Second, plaintiff does not contest the authenticity of Exhibit HH to the McCaffrey Declaration, which purports to be a letter from Arthur Maratea, Vice President of the TCU, complaining that plaintiff subjected the ASMs to a hostile work environment. Although plaintiff may question the veracity of Maratae's claims, it is beyond dispute that the union was unhappy with plaintiff. Even assuming that this unhappiness was due to plaintiff's gender—and there is no evidence that it was—the union's animus cannot be attributed to the LIRR.

Third, there is no question that Barrett accused plaintiff of yelling at her on December 21, 2011. The record includes a transcript of a statement that Barrett gave before Trial Officer Joe Mutone on December 29, 2011, attesting to the incident. (McCaffrey Declaration, Ex. DD.) Although plaintiff questions the accuracy of Barrett's statement, the record contains a transcript of a statement that a witness, Suzanne Clark, gave to Mutone, which largely corroborates Barrett's testimony. (*Id.*, Ex. EE.) Even if plaintiff could establish that Barrett and Clark fabricated their accounts, there is no evidence that these women's actions were motivated by gender animus, rather than a longstanding personality conflict.

Fourth, the record contains emails which provide documentary evidence to support Brooks' charge that plaintiff persisted for at least eight months in resisting the transfer of the ASM Board long after Brooks informed plaintiff of his intention to

66

authorize the transfer.  In an email dated March 22, 2010, Brooks
informed plaintiff that he had already committed to both the
Inspector General and the President's Office to transfer the ASM
Board to the Crew Dispatcher.  (McCaffrey Declaration, Ex. S.)
Nonetheless, plaintiff continued to press her case for retaining
control over the ASM Board, prompting Brooks to agree to "take
another look" at the decision to transfer the Board.  (McCaffrey
Declaration, Ex. V.)  In response to an email which plaintiff sent to
Brooks following a July 12, 2010, meeting, in which plaintiff tacitly
acknowledged bypassing her immediate supervisor, Brooks complemented
plaintiff's tenacity.  (*Id*.)  However, by late January 2011, Brooks
was beginning to lose patience, telling plaintiff that he was "not
willing to re-litigate this issue" and expected "every manager" to
"do everything in their power to ensure its success."  (McCaffrey
Declaration, Ex. QQ, p. 1.)  There is no evidence that Brooks'
annoyance with plaintiff was not genuine or that it was in any way
related to her gender.

     Fifth, the record contains an email chain from mid-July
2011, which evinces plaintiff's dissatisfaction with having the Crew
Office decide the ASM's requests for compensatory, vacation and
personal days.  (McCaffrey Declaration, Ex. W.)  In that chain,
plaintiff noted that she complained about the change in a meeting on
July 11, 2011, and admitted that she did not communicate the change
to the ASMs even though she had been told to do so by Papanikolatos.

(*Id.*)  Although plaintiff professed to be  confused regarding whether
she was supposed to send an email announcing the change,
Papanikolatos did not credit her explanation, stating: "I thought I
was clear when I asked you to send the email and I also believe you
wrote it down in you[r] notes." (*Id.*)  This email exchange provides
support for Brooks' claim that plaintiff was clinging to some
responsibilities relating to the ASMs despite directions not to do
so.  There is no proof that Brooks' displeasure with plaintiff's
obstinance was not genuine or that it was in any way motivated by
gender-based animus.

### 6.  *Pay Disparity*

Defendant's Memo does not argue that the LIRR's decision to
pay plaintiff less than Cameron was earning at the time of his
retirement was not an adverse employment action or that this action
did not occur under circumstances giving rise to an inference of
discrimination.   However, Defendant's Memo does argue that the LIRR
has established legitimate reasons for taking the actions that it did
and that plaintiff has not established that these reasons were
pretextual.

As the court has already noted in discussing plaintiff's
Equal Pay Act Claim, *see* pp. 32-38, *ante*, defendant offered evidence
to show that the differential between Cameron's salary upon
retirement and plaintiff starting salary was due to merit and
seniority.  First, the differential was almost entirely due to the

fact that Cameron had received a 3% merit raise in September 2006, without which the pay differential would have been 2/10th of 1 percent. Second, that minuscule difference in salary was more than justified by the disparity in seniority and experience between Cameron, who was retiring with over three years of experience in the GSM position, and plaintiff, a 30-year-old who had served as Cameron's assistant for three years and served as Acting GSM for only a few months thereafter.

Plaintiff has not introduced any evidence to suggest that these reasons were mere pretexts for gender discrimination. Plaintiff's Memo asserts that plaintiff was given various accounts of who in the LIRR organization had the authority to grant her a raise and that this created some inference of discrimination. (Plaintiff's Memo, pp. 16-17.) Assuming this is correct, the inference of discrimination would only serve to establish a prima facie case, not to establish that defendant's proffered reasons were pretextual.

### D. Hostile Work Environment

As with the discrete discrimination claims discussed above, "[h]ostile work environment claims under both Title VII and the NYSHRL are governed by the same standard." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013) (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)). "In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that 'the harassment was sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment' and (2) that there is a 'specific basis for imputing the conduct creating the hostile work environment to the employer.'" *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold v. New York*, 366 F.3d 138, 149-50 (2d Cir. 2004)). However, "[i]t is axiomatic that mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Accordingly, a hostile work environment claim based on sex discrimination requires evidence that "the hostile or abusive treatment was because of . . . [the plaintiff's] sex." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012).

In assessing hostile work environment claims, it is "important . . . to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). Thus, "[i]n assessing the 'totality of the circumstances' offered to prove a hostile work environment [in gender discrimination cases], a fact-finder may consider only abusive conduct proven to be 'based on sex.'" *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010) (quoting *Alfano*, 294 F.3d at 378). As the Second Circuit has noted:

> This may be proven by 'harassment in such
> sex-specific and derogatory terms as to make it
> clear that the harasser is motivated by general
> hostility to the presence of women in the
> workplace' . . . or by offering 'some
> circumstantial or other basis for inferring that
> incidents sex-neutral on their face were in fact
> discriminatory.' A plaintiff may rely on
> incidents of sex-based abuse to show that other
> ostensibly sex-neutral conduct was, in fact,
> sex-based.

*Id.*, at 117-18 (alterations in the original) (quoting, *inter alia*,

*Alfano*, 294 F.3d at 378).

In this case, plaintiff's hostile work environment claim

relies principally on the acts which were alleged to constitute

discrete acts of gender discrimination. (*See* Amended Complaint, ¶¶

25-32.) As discussed in detail above, the court has already found

that there is insufficient evidence to infer that these acts were

based on sex. Accordingly, none of these acts can be considered in

analyzing plaintiff's hostile work environment claim. *See Pucino*,

618 F.3d at 117; *Alfano*, 294 F.3d at 378.

The only other two acts identified in plaintiff's Amended

Complaint as contributing to the hostile work environment were the

"forgery" of plaintiff's signature and her placement in a cubicle.

The forgery allegation is not discussed in any detail in plaintiff's

Memo, but apparently had something to do with the Trial Department's

signing plaintiff's name to paperwork charging plaintiff's

subordinates with infractions. (*See* Pl. Dep. II, p. 70, 78.)

Defendant has adduced evidence that it was the Trial Department's

"practice ... to execute the name of the employee's immediate supervisor on trial notices," and that this "practice was followed without regard to a supervisor's gender." (Declaration of Scott Petraglia dated Dec. 7, 2014, ¶ 6.) Plaintiff has introduced no evidence to dispute Petraglia's statements. Indeed, at her deposition, plaintiff testified that she had no knowledge regarding whether male supervisor's names were also signed by the Trial Office. (Pl. Dep. II, p. 80.)

Similarly, plaintiff has adduced no evidence that her placement in a cubicle was an act of discrimination. By plaintiff's own account, there were no offices available when she arrived at the Jamaica Control Center. (*Id.*, p. 139.) Plaintiff inquired about bumping a lower-ranking manager from his office, but was informed the manager had been rejected for a promotion and that management did not "really want to hurt his feelings" by forcing him to move. (*Id.*, p. 142.) Plaintiff offered no evidence to establish that this reason was merely a pretext for impermissible retaliation. To the contrary, she herself testified that she did not know whether the refusal to move the manager was due to gender discrimination or constituted retaliation. (*Id.*, p. 143.)

In addition to the acts specifically alleged in the Amended Complaint, plaintiff argues that defendant "forced" plaintiff to take Barrett as her assistant and took no "corrective and/or remedial measure[s]" to protect plaintiff. Plaintiff's Memo implies that

these acts alone may be the basis for a meritorious hostile work environment claim, noting that "a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (Plaintiff's Memo, p. 31 (quoting *Feingold*, 366 F.3d at 150).) However, plaintiff's allegations that defendant "forced" plaintiff to take Barrett and took no corrective measures are unsupported.

First, there is no question that Barrett and plaintiff had an acrimonious relationship which pre-dated Barrett's tenure as plaintiff's assistant. According to a document provided by plaintiff, Barrett, an ASM, became unhappy with the assignments which plaintiff gave her, and Barrett "made disparaging comments about, and veiled threats against" plaintiff sometime in 2010. (Zabell Declaration, Ex. 14, p. 1.) Upon learning of Barrett's comments and threats in July 2010, plaintiff filed an internal complaint with the LIRR. (*Id.*, p. 2.) Although Barrett responded by filing a charge of discrimination against plaintiff (*id.*), there is no evidence that Barrett's actions against plaintiff were based on sex. Moreover, while plaintiff's complaint against Barrett was investigated and found to be unsubstantiated, there is no evidence that this result was attributable to gender discrimination.

Although the LIRR was doubtless aware of the history between plaintiff and Barrett, it did not "force" Barrett upon plaintiff. As discussed on pages 61-62, *ante*, the system for

appointing the GSM's assistant was changed after the TCU objected to
having plaintiff's assistant, Sloane, appear for plaintiff in
management meetings.  The union's objection was eventually resolved
through the creation of a new "N1" position—a represented position
which could be "bid" for by union members and would be filled based
on seniority.  Barrett used her seniority to successfully bid the
job.  There is no evidence that the LIRR anticipated or encouraged
this result, or that it had the power to deny Barrett the position.

There is also no evidence that plaintiff requested
"corrective and/or remedial measure[s]" at any time after Barrett was
awarded the N1 Position.  To the contrary, the only claims of
misconduct arising from plaintiff's interaction with her new
assistant came from Barrett, not plaintiff.  Although plaintiff
asserts that Barrett's claims were false and implies that Clark
corroborated them solely because "plaintiff's past decisions
negatively impacted" Clark (Plaintiff's Memo, p. 33), plaintiff has
not shown that the LIRR engaged in gender discrimination by crediting
their accounts.

### E.  *Retaliation*

Title VII retaliation claims and state-law retaliation
claims are both analyzed pursuant to the *McDonnell Douglas*
burden-shifting framework.  *Littlejohn*, 795 F.3d at 315; *Zann Kwan v.
Andalex Group LLC*, 737 F.3d 834, 843 (2d Cir. 2013)  "Under the first
step of the . . . framework, the plaintiff must establish a prima

facie case of retaliation by showing 1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" *Zann Kwan*, 737 F.3d at 844 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). The plaintiff's burden at this first step is "*de minimis*," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute*, 420 F.3d at 173).

With respect to the first element, "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000) (internal quotation marks omitted) (citing 42 U.S.C. § 2000e-3); *see Mi-Kyung Cho v. Young Bin Café*, 42 F. Supp. 3d 495, 507 (S.D.N.Y. 2013) (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312-13 (2004) ("Protected activity within the meaning of the NYSHRL . . . is conduct that 'oppos[es] or complain[s] about unlawful discrimination.'"). The "opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection." *Cruz*, 202 F.3d at 566. Rather, opposition "includes activities such as 'making complaints to management, writing critical letters to customers, protesting against

discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Id.* (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). "However, while such complaints may be informal, they cannot be so vague or 'generalized' that the employer could not 'reasonably have understood [ ] that the plaintiff's complaint was directed at conduct prohibited by Title VII.'" *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)) (brackets add in *Bowen-Hooks*).

With respect to the second element, "a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." *Zann Kwan*, 737 F.3d at 844. A plaintiff need not show that the corporate official responsible for the adverse employment action knew of the protected activity. *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). However, "[t]he lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment." *Id.* at 117.

With respect to the third element, the term "adverse employment action" has a slightly different meaning than it does in the context of a Title VII discrimination claim. As the Supreme court has noted, Title VII's antiretaliation provision "protects an

76

individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Accordingly, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotations and citations omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" are not likely to deter victims of discrimination from complaining to the EEOC, and are normally too trivial to support a retaliation claim. *Id.*

With respect to the fourth element, "proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon*, 232 F.3d at 117. The Supreme court has noted that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253

(10th Cir. 2001), and citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)). However, the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation ...." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan*, 737 F.3d at 845 (citing *Brennan*, 650 F.3d at 93). If the employer meets this burden, "the presumption of retaliation arising from the establishment of the prima facie case drops from the picture." *Id.* (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). The plaintiff must then "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001). In addition, the plaintiff must show that "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, —U.S.—,—, 133 S. Ct. 2517, 2528 (2013). This causation standard "does not require proof that retaliation was the only cause of the employer's action, but only

78

that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.*

In arguing for summary judgment with respect to plaintiff's retaliation claims, defendant focuses on four adverse employment actions: (1) the transfer of the ASM Board; (2) plaintiff's reassignment to Manager Hours of Service; (3) plaintiff's reassignment to a cubicle; and (4) the rejection of plaintiff's applications for other jobs. (Defendant's Memo, pp. 28-30.) Plaintiff's Memo confirms that these are among the adverse employment actions that give rise to plaintiff's retaliation claims. (Plaintiff's Memo, p. 23.) Plaintiff's Memo implies that there may be "other acts" which could give rise to retaliation claims, (*id.*), but has not identified these "other acts."

The court notes that during the pendency of this action, plaintiff commenced a second case: *Fraser v. MTA Long Island Rail Road*, No. 14-CV-7222 (SLT)(CLP). The complaint in this second action raised retaliation claims under Title VII, the NYSHRL and the NYCHRL, alleging that defendant retaliated against her by rejecting five job applications she made to the LIRR between July 2012 and July 2014. Three of these job rejections form the basis for the fourth of the

four retaliatory acts alleged by defendant in this action.
Accordingly, the court will reserve decision on the retaliation
claims stemming from the job rejections and will address these claims
in a separate opinion adjudicating defendant's motion for summary
judgment in the second action.  The court will limit its retaliation
analysis in this case to the three other adverse employment actions
specifically identified by both parties.

### 1.  *Transfer of the ASM Board*

In arguing that the transfer of the ASM Board was not
retaliation, defendant principally argues that plaintiff did not
engage in protected activity before the decision to transfer the ASM
Board was made.  Defendant notes that Brooks told plaintiff in his
March 22, 2010, email that he had already committed to transfer the
ASM Board to the Crew Dispatcher.  (*See* McCaffrey Declaration, Ex.
S.)  Defendant asserts that plaintiff did not formally complain about
gender discrimination until sometime after that date.

In response, plaintiff relies on her own testimony
concerning a conversation that she had with Williams Gibbons, the
General Superintendent of Penn Station.  Plaintiff could only vaguely
recall when this conversation took place, initially claiming that she
could not recall whether it occurred prior to March 22, 2010, (Pl.
Dep. II, p. 21), but later asserting that it occurred before she
received Brooks' March 22, 2010, email.  (*Id.*, p. 22.)  In addition,
she could only vaguely describe the substance of the conversation,

although she remembered complaining that "everything" was "shifting and changing," (*id.*, p. 21), and that the changes were occurring because she was a woman.  (*Id.*, p. 22.)

Although plaintiff's complaints may have been vague, the court cannot find as a matter of law that Gibbons could not "reasonably have understood [ ] that the plaintiff's complaint was directed at conduct prohibited by Title VII."  *See Bowen-Hooks*, 13 F. Supp. 3d at 222; *Rojas*, 660 F.3d at 108.  Moreover, because it is unclear precisely when Brooks decided to transfer the ASM Board, the court cannot find that the Brooks' decision preceded plaintiff's conversation with Gibbons.  Accordingly, the court cannot find that plaintiff did not engage in protected activity before the decision to transfer the ASM Board was made.

Defendant also argues, however, that the LIRR has articulated legitimate reasons for transferring the ASM Board and that plaintiff has not established that these reasons were pretextual.  (Defendant's Memo, p. 30.)  The court agrees.  As the court has already noted in the course of granting summary judgment on plaintiff's Title VII and NYSHRL discrimination claims, Brooks articulated several reasons for switching the responsibility for assigning the ASMs from the GSM to the Crew Dispatcher, noting that the switch would improve transparency without increasing costs, give clerical work to clerical employees, and free the manager to manage. (*See* p. 56, *ante* (quoting McCaffrey Declaration, Ex. S).)  In his

declaration, Brooks also noted that "ASMs were the last . . . non-management represented employees[] . . . w[h]ere assignments were not handled by the Crew Management Office." (Brooks Declaration at pp. 4-6.) Plaintiff has not adduced any evidence to establish that these reasons were pretextual.

### 2. *Reassignment to Manager Hours of Service*

Similarly, defendant argues that Brooks articulated legitimate, non-retaliatory reasons for reassigning plaintiff in his April 24, 2012, letter, which is attached to the McCaffrey Declaration as Exhibit KK. (*See* defendant's Memo, p. 29.) Plaintiff has not adduced any evidence to establish that these reasons were pretextual. Rather, plaintiff merely asserts that the allegations of misconduct listed in Brooks' letter "are each materially false." (Plaintiff's Memo, p. 25.) Plaintiff offers no evidence to support this assertion, but argues that "it is only logical to conclude" that plaintiff would have been terminated, and not merely transferred, if all of the allegations were true. (*Id.*)

The record contains ample evidence to substantiate Brooks' reasons for reassigning plaintiff. First, plaintiff herself admitted contacting Lieui and giving him information regarding when and where to report, although she claimed any usurpation of Human Resources' role was unintentional. (*Id.*, p. 123.) Second, the record contains a copy of a January 5, 2012, letter to Brooks from the National Vice President of the TCU, complaining about plaintiff's behavior.

(McCaffrey Declaration, Ex. HH.)  Brooks stated that this letter was "the first time in [his] tenure as CTO that [he] received a letter from a union complaining that its members felt threatened by a supervisor."  (Brooks Declaration, p. 12.)  Third, the record contains transcripts of statements made by Barrett and Clark, which substantiate Brooks' claim that plaintiff behaved inappropriately during the December 21, 2011, incident.  (McCaffrey Declaration, Exs. DD & EE.)  Finally, the record also contains e-mails substantiating Brooks' claims that plaintiff resisted the transfer of the ASM Board long after Brooks announced his decision to do so, (McCaffrey Declaration, Ex. QQ), and disregarded Papanikolatos's direction that she inform the ASMs that the Crew Management Office would decide their requests for compensatory, vacation and personal days. (McCaffrey Declaration, Ex. V.)

To be sure, the record contains proof contradicting some of the evidence on which Brooks relied.  For example, plaintiff herself provided a statement and testimony rebutting Barrett's and Clark's accounts of the December 21, 2011, incident, (McCaffrey Declaration, Ex. GG), and provided an affidavit noting that the TCU was the only union to issue a complaint about her.  (Affidavit of Charmaine Fraser dated Feb. 5, 2015, ¶ 19.)  However, Brooks apparently credited Barrett, Clark and the TCU.  The fact that he did so, and chose to reassign plaintiff rather than terminate her, does not establish that the reasons listed in his April 24, 2012, were pretextual.

### 3. *Reassignment to a Cubicle*

Defendant advances two arguments in opposition to plaintiff's claim that her reassignment to a cubicle was an act of retaliation. First, relying on *Roncallo v. Sikorsky Aircraft*, 447 F. App'x 243 (2d Cir. 2011) (summary order), defendant argues that "[a] temporary move from an office to a cubicle does not constitute a materially adverse employment action." (Defendant's Memo, p. 29.) Second, defendant argues that, even if it did, the LIRR articulated a legitimate reason for assigning plaintiff to a cubicle, and that plaintiff has not established that this reason was a pretext for retaliation.

The court is not persuaded by the first of these arguments. *Roncallo* did not categorically hold that a temporary reassignment to a cubicle can never be a materially adverse employment action. Rather, it held that Roncallo's "temporary move from an office to a cubicle, consistent with Sikorsky's office allocation . . . does not constitute a materially adverse employment action." *Roncallo*, 447 F. App'x at 245-46. In this case, in contrast, there is evidence that LIRR's policy entitled plaintiff to Grippaldi's office because her position had more Hay Points than his. (Pl. Dep. II, pp. 140-41.)

The court is persuaded, however, by defendant's second argument. In her own deposition testimony, plaintiff discussed the LIRR's reason for not giving her Grippaldi's office. As noted on page 72, *ante*, plaintiff's supervisor told plaintiff that Grippaldi

had been rejected for a promotion and that management did not "really want to hurt his feelings" by forcing him to move. (*Id*., p. 142.) Plaintiff not only offered no evidence to establish that this reason was merely a pretext for impermissible retaliation, but testified that she herself did not know whether the refusal to move Grippaldi was due to gender discrimination or constituted retaliation. (*Id*., p. 143.)

## IV. *The NYEPL and NYCHRL Claims*

A district court "may decline to exercise supplemental jurisdiction over a claim ... [if]... the district court has dismissed all claims over which it has original jurisdiction ...." 28 U.S.C. § 1367(c)(3). Although "[t]he exercise of supplemental jurisdiction is within the sound discretion of the district court," *Lundy v. Catholic Health Sys. of Long Isl. Inc.*, 711 F.3d 106,117 (2d Cir. 2013), the Second Circuit has stated that if a plaintiff's federal claims are dismissed before trial, pendant state and city claims should be dismissed as well. *See Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (quoting *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008)). This rule is consonant with the Supreme court's observation that when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point

toward declining to exercise [supplemental] jurisdiction . . . ."
*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

For the reasons stated above, the court grants summary judgment with respect to plaintiff's Title VII, NYSHRL and EPA claims. However, the court declines to exercise supplemental jurisdiction over plaintiff's NYEPL and City-law claims. *See Brzak*, 597 F.3d at 113-14. The court will dismiss these three NYEPL and City-law causes of action without prejudice to pursuing them in State court.

### *CONCLUSION*

For the reasons stated above, defendant's motion for summary judgment is granted with respect to the first, second, fourth, fifth, and seventh claims for relief set forth in plaintiff's Amended Complaint. The court declines to exercise supplemental jurisdiction over the third, sixth, and eighth claims for relief, which are dismissed without prejudice to pursuing them in State court. The Clerk of Court is directed to enter judgment for defendant in accordance with this Memorandum and Order and to close this case.

**SO ORDERED.**

                                   /s/
_____
                          KIYO A. MATSUMOTO
                    United States District Judge

Dated: March 31, 2018
       Brooklyn, New York